STATE OF NORTH CAROLINA v. CEPHUS JEROME DAWSON, NATHANIEL SMITH, AND SAMUEL VEREANELL ROSEBORO

No. 36

(Filed 31 July 1972)

**1. Criminal Law § 92— denial of motion for severance**

The trial court did not err in the denial of defendants' motion for severance of their rape trial where defendants were jointly indicted for the rape of the same person, and the evidence upon which the State relied for conviction of each relates to a single transaction and involves all defendants, notwithstanding the State's evidence tended to show that only one defendant had sexual intercourse with the victim and the guilt of the other two defendants, if any, rested on evidence that they aided and abetted the first defendant in the commission of the crime.

**2. Jury § 5— jury selection — questioning conducted by court**

Although G.S. 9-15(a) assures a defendant of the right to have due inquiry made as to the competency and fitness of any person to serve as a juror, the actual questioning of prospective jurors to elicit the pertinent information may be conducted either by the court or by counsel for the State and counsel for the defendant; the trial judge, in his discretion, may decide which course to pursue in a particular case.

**3. Rape § 5— principals in second degree — sufficiency of evidence**

The State's evidence was sufficient to support a conviction of two defendants for the crime of rape as principals in the second

degree where it tended to show that such defendants were standing by while a third defendant committed a rape, that they were undertaking to protect the third defendant from interference, that each of them obstructed the attempts of two witnesses to rescue the victim from the third defendant, and that the three defendants together fled from the scene while a witness was trying to call the police.

**4. Criminal Law § 99— ejectment of spectators**

The trial court in a rape prosecution did not err in ejecting two black girls from the courtroom for disrupting the trial and in instructing them not to return to the courtroom until they decided to behave themselves.

**5. Rape § 6— failure to submit lesser degrees**

In this rape prosecution, the trial court did not err in failing to submit lesser included offenses to the jury where the State's evidence tended to show that one defendant was guilty of rape as principal in the first degree and that the two remaining defendants were guilty as principals in the second degree of the crime committed by the first defendant, and there was no evidence from which the jury could find that any defendant committed an included crime of lesser degree.

Justice LAKE concurring in result.

APPEAL by defendants from *Cooper, J.,* August-September 1971 Criminal Session of COLUMBUS.

Defendants, Cephus Jerome Dawson (Dawson), Nathaniel Smith (Smith) and Samuel Vereanell Roseboro (Roseboro), were jointly indicted for the rape of one Edell Hughes on July 18, 1971.

Upon arraignment on September 2, 1971, each defendant, through Edward L. Williamson, Esquire, his court-appointed counsel, pleaded not guilty. Defendants' motions for severance of the cases were denied and each defendant excepted. Thereupon, a jury was selected, sworn and empaneled. Evidence was offered by the State and in behalf of defendants. None of defendants testified.

STATE'S EVIDENCE

*Testimony of Mrs. Edell Hughes*

Mrs. Edell Hughes testified that she left home about 10:30 or 11:00 p.m. on the night of Saturday, July 17, 1971, and started walking toward Whiteville, N. C., where she was employed at the Whiteville Convalescent Center. Ordinarily, she went to work by car, a distance of a mile and a quarter; but

her husband had left in their car and was not expected back that night. Mrs. Hughes had to be at work at 6:00 a.m. Sunday morning, July 18th. Since she "didn't have any transportation to work the next morning," she decided to go to Whiteville and spend the night there with a friend or at the hotel.

When attacked, Mrs. Hughes was in the middle of Pine Log Road, walking toward U. S. Highway 701 By-Pass. As she "neared" the Sherwood Drive-In and Sellers Service Station, three or four "colored" surrounded and "grabbed hold of her" and "started taking her off of the street." When she begged them to leave her alone, they would not listen but told her they would kill her "if she didn't stop that noise." They carried her "off the street." Her slacks were torn off. She was hit on the side of her head. Somebody "got on top of her and proceeded to have intercourse." She did not recognize any of them.

The "next thing she knew," she heard someone say, "Get off that white woman and leave her alone." A boy and a girl had come to her rescue. Both were colored. Mrs. Hughes did not know them and had never seen them. After the girl had helped Mrs. Hughes get her clothes on, the boy and girl took Mrs. Hughes to the police station.

## Testimony of Viola Collins

Viola Collins testified that she was at the Sherwood Drive-In between 12:30 and 1:00 a.m. on Sunday, July 18th. A "boy named Dennis," with whom she had come to the Sherwood Drive-In, had gone "around to the back" and, upon his return, he "told her not to go around there because they had a white woman around there." Contrary to Dennis's advice, she "went on around behind the building, a distance of about the length of the courtroom to a point behind Pridgen's Refrigerator Service and Sellers Gas Station, a vacant lot." She then saw Dawson on top of the lady later identified as Mrs. Hughes. Four or five other people were there but she heard no one say anything to Dawson.

Dawson was "on top [of Mrs. Hughes] having intercourse with her." Smith and Roseboro were "standing there." Viola Collins told Dawson "to get up" and pulled "a towel or something" from Mrs. Hughes's face and got her by the arm. Mrs. Hughes, who seemed to have been "asleep or something," then "woke up," grabbed Viola Collins by the arm and asked for

help. Viola Collins tried to pull Dawson off of Mrs. Hughes, but he would not get up and told her to wait until he had finished. She then told him: "[Y]ou stay there until you finish and I am going to call a cop." While she was trying to get Dawson off of Mrs. Hughes, Smith, who "was standing a foot from [Dawson]," told her to leave Dawson alone. Roseboro "told her to shut up and get away or they would get her down."

After Dawson had refused to get off of Mrs. Hughes, Viola Collins then went to the Sherwood Drive-In for some change and then went to the phone booth. She "didn't know the number" and could not get the operator. She then "went back around there" and found that "all of them had gone." Mrs. Hughes's face was bruised on the side. She helped Mrs. Hughes get her clothes on and then she and Larry McMillan took Mrs. Hughes to the police station.

On cross-examination, Viola Collins testified that Mrs. Hughes said something about having had a quarrel with her husband; that Mrs. Hughes said that, after she had left home, some white boys picked her up and put her out down by Sellers Service Station; and that Mrs. Hughes had been drinking but she (Viola Collins) "didn't know about her being drunk."

### Testimony of Larry McMillan

Larry McMillan testified that he knew Dawson, Smith and Roseboro and that he was at Sherwood Drive-In between 12:30 and 12:40 a.m. on July 18th. As a result of what "a guy" said, he "went around there" and saw Dawson "having intercourse with the lady." Dawson had his pants down to his ankles. He heard Roseboro tell Dawson "that he was greedy" and he heard Smith say something to Viola Collins but "didn't know what it was." He tried to make Dawson "get up off the lady." Dawson swung his left arm back but did not hit McMillan. While Dawson "was on her," Smith was standing about two feet from Dawson's head and Roseboro was standing about two feet to the right of Smith. Viola Collins ran to call the police. The three defendants left together, running. Viola Collins returned and "helped the lady" find her clothes. He and Viola Collins helped Mrs. Hughes put her clothes on and stood her up. Mrs. Hughes fell back when she attempted to stand alone and they helped her up again.

Larry McMillan further testified that "he heard Mrs. Hughes say please get up, and Viola turned to Dawson and told him to get off."

### Testimony of Dr. F. M. Carroll

F. M. Carroll, a medical doctor, testified that on July 18, 1971, about 1:25 a.m., he made an examination of Mrs. Hughes "and in particular the pelvis examination." He observed that there was a bruise and abrasion on the left side of her face and left shoulder and some bruises on her back, mostly on the left side. She was "dirty and a lot of dirt and grass were on her clothes." "[H]er back and external female parts were dirty with grass and dirt about this area." "[S]he was undergoing a menstrual period." A microscopic examination of secretion taken from her vagina disclosed that sperm were present, and in his opinion she had had intercourse with someone within three or four hours. On the occasion of his examination, "intoxication was not noticeable."

### Testimony of George Dudley

George Dudley testified that he is a Sergeant in the Whiteville Police Department and that he investigated the alleged rape of Edell Hughes on July 18, 1971. Each of the defendants made a statement to him. The court sustained defendants' objections to statements, if any, made by them to Sgt. Dudley.

### DEFENDANTS' EVIDENCE

### Testimony of Tony H. Shipman

Tony H. Shipman testified that he is 14 years of age. About 11:30 p.m., when walking in "the most direct route" from the bowling alley on U. S. 701 By-Pass to the Sherwood Drive-In he saw the lady later identified as Mrs. Hughes. She was lying on the grass, with her head resting on a suitcase, "between Pridgens and Sellers," about 50 yards off the paved sidewalk that ran along the edge of Powell Boulevard. She "had on pants, blouse, and shoes." He "ran to the Sherwood and told someone she was there." He "went back there with someone" and "the lady was still there, lying in about the same position." She was "not awake," and made no response when he tried to talk to her. She "did not ever say anything in his presence and she did not get up." Defendant Smith was one of "a lot of people" who went back there with him. Shipman did not see Roseboro

or Dawson. He left for his home in a friend's car and he did not know whether defendant Smith was still there when he left to go home. Shipman did not attempt to help the lady, "just glanced at her and left."

### Testimony of Sylvester Baldwin

Sylvester Baldwin testified that he operates the Sherwood Drive-In. He was at his place of business from about 7:00 p.m. on Saturday, July 17th, until about 2:00 a.m. on Sunday, July 18th, "waiting on customers." He went outside the building several times that night. There were "several people," "quite a crowd," out in front. He did not recall having seen a white woman on Pine Log Road in front of his place of business at any time that night. He did not learn of the alleged offense until about 2:00 a.m. "[H]e did not go back there behind the Drive-In nor did anyone come in and tell him about what was going on." He had known defendant Dawson well since he was about nine years old but did not know the other two defendants.

### Testimony of Bobby Randall

Bobby Randall testified that he lives in Whiteville, is 23 years of age, and has known the defendants a long time. On the night of July 17, 1971, he "was down [at Sherwood Drive-In] from about 9:00 to 11:30, just sitting around drinking beer and talking." He left "about 11:30" but "went back to Sherwood about 12:00 or 12:15." "[H]e did not recall seeing a white woman walking down the road with a suitcase." "[H]e was sitting out in front of Sherwood before he left at about 11:30 and quite a few people were sitting in cars." "[H]e was in front of Sherwood when Viola Collins came around the building." She asked him to take her and her father across town, and he agreed. "[W]hen he started out, someone from behind the building came and told us that they got a woman back there." "[H]e also went back there, in the area where the activity was taking place and there were quite a few back there when he got there," "between seven and ten people." "[H]e did not know about what happened back there in the lot and did not know whether or not Mrs. Hughes walked down the road with a suitcase."

### CHARACTER WITNESSES

Annie P. Shipman, age 72, and Mrs. J. E. Baldwin, age 70, and Mamie Maultsby, age 81, testified with reference to the

general reputation of Roseboro. John Bennett testified with reference to the general reputation of Dawson. Freddie Barkley testified with reference to the general reputation of Smith.

(Note: When referring to events which occurred on Saturday, which was July 17, 1971, certain witnesses erroneously referred to such events as having occurred on July 18, 1971, which was Sunday.)

As to each of the three defendants, the jury returned a verdict of guilty of rape with a recommendation of life imprisonment. Thereupon the court, in separate judgments, sentenced each defendant to life imprisonment.

Each defendant excepted and appealed.

An order entered by the trial judge extended the time for docketing the record on appeal in the Appellate Division.

*Attorney General Morgan and Associate Attorney Lloyd for the State.*

*Edward L. Williamson for defendant appellants.*

BOBBITT, Chief Justice.

[1] Defendants' assignments of error based on exceptions to the denial of their motions for severance are without merit. Defendants were jointly indicted in a single bill for the rape of Mrs. Edell Hughes on July 18, 1971. The evidence upon which the State relied for the conviction of each relates to a single transaction and involves all defendants.

The record does not disclose what reason, if any, was advanced in the trial court in support of the motions for severance. In this Court, Smith and Roseboro assert that they were prejudiced by their trial with Dawson because the State's evidence tended to show Dawson had actual sexual intercourse with Mrs. Hughes but that their guilt, if any, rested on evidence tending to show that they aided and abetted Dawson in his commission of the crime of rape.

It was proper and appropriate for the three defendants to be tried together. The court properly instructed the jury that they would return verdicts of not guilty as to Smith and Roseboro if they failed to find beyond a reasonable doubt that Daw-

son committed the actual completed crime of rape. Too, the court properly instructed the jury that, if they found Dawson guilty of rape, they would consider and determine separately whether Smith was guilty of rape as an aider and abettor and whether Roseboro was guilty of rape as an aider and abettor. Properly, the court gave a separate charge or mandate as to each defendant in respect of the essential findings necessary to warrant a verdict of guilty as to that defendant.

Defendants have failed to show prejudice on account of the denials of their motions for severance. No evidence of any statement made by any defendant was admitted which tended to incriminate or prejudice any other defendant.

The jury was selected in the manner described and approved in *State v. Perry,* 277 N.C. 174, 176 S.E. 2d 729 (1970), and approved in *State v. McNeil,* 277 N.C. 162, 176 S.E. 2d 732 (1970), and in *State v. Willis, ante* 558, 189 S.E. 2d 190 (1972). There is no merit in defendants' assignment of error challenging this jury selection procedure.

[2]   Defendants assign as error the denial of their counsel's request that he be permitted to question the prospective jurors as to their fitness and competency to serve as jurors.

The agreed case on appeal contains the following: "After the selection of the twelve jurors had been completed for the State, the attorney for the defendants requested permission of the presiding Judge that he be permitted to ask questions of the jurors on behalf of the defendants in the selection of the jury. The Court denied the request of the attorney for the defendants and informed counsel for the defendants that said counsel will not direct their own questions to the jury. Counsel for the Defendants thereupon made a request of the presiding Judge that he be allowed to conduct personal interrogation of each of the jurors, please. The presiding Judge denied the request and required counsel for the defendants to present the questions to the presiding Judge who would conduct his own voir dire. DEFENDANTS' EXCEPTION NO. 3."

.   A motion by the Attorney General suggesting diminution of the record was allowed by this Court. Defendants interposed no objection. Pursuant thereto an addendum was filed which contains a full transcript of the jury selection proceedings. The transcript discloses the following:

State v. Dawson

After twelve persons were called and seated in the jury box, the presiding judge proceeded to question these prospective jurors as to whether any of them knew (1) any of the defendants, (2) defendants' counsel, (3) the solicitor, (4) Mrs. Hughes, (5) Viola Collins, (6) Larry McMillan or (7) George Dudley. Each prospective juror who gave an affirmative response was then questioned closely by the court with reference to whether his (her) relationship would affect his (her) ability to base his (her) verdict solely on the evidence. Each juror stated his (her) name, address, and place of employment. In response to the court's inquiry, the solicitor announced that the State did not wish to challenge any of the jurors but was satisfied with those then seated in the jury box.

After the State had accepted the original twelve, the court asked defendants' counsel if he wished "the Court to ask any additional questions." Defendants' counsel stated that he "would like permission to ask questions on behalf of the defendants [himself], if the Court would permit it." To this request, the presiding judge replied that he would be happy to ask any questions defendants' counsel wanted him to ask, but that under the procedure they were using counsel "will not direct their own questions to the jury." Thereafter, the judge did ask all questions he was requested to ask by defendants' counsel, including questions addressed to particular prospective jurors as well as to those addressed to all. At the conclusion of this further questioning by the court, defendants' counsel challenged peremptorily four of the prospective jurors and accepted eight of them. The State accepted all the four prospective jurors called to replace the four challenged peremptorily by defendants. This procedure continued until the twelve who were sworn and empaneled had been accepted by the State and by defendants.

The transcript contains no entry of an objection or exception by defendants' counsel to the jury selection procedure.

Prior to final acceptance, the State had used only one of the twenty-seven peremptory challenges to which it was entitled under G.S. 9-21(b), and defendants had used only eight of the forty-two peremptory challenges to which they were entitled under G.S. 9-21(a).

G.S. 9-15(a) provides: "The court, or any party to an action, civil or criminal, shall be allowed, in selecting the jury,

to make inquiry as to the fitness and competency of any person to serve as a juror, without having such inquiry treated as a challenge of such person, and it shall not be considered by the court that any person is challenged as a juror until the party shall formally state that such person is so challenged."

In *State v. Allred*, 275 N.C. 554, 558-59, 169 S.E. 2d 833, 835 (1969), we quoted with approval the following from *State v. Brooks*, 57 Mont. 480, 486, 188 P. 942, 943 (1920), *viz:* "The *voir dire* examination of jurors is a right secured to the defendant by the statutes and has a definite double purpose: First, to ascertain whether there exist grounds for challenge for cause; and, second, to enable counsel to exercise intelligently the peremptory challenges allowed by law."

Although G.S. 9-15 (a) assures a defendant of the right to have due inquiry made as to the competency and fitness of any person to serve as a juror, the actual questioning of prospective jurors to elicit the pertinent information may be conducted either by the court or by counsel for the State and counsel for the defendant. The trial judge, in his discretion, may decide which course to pursue in a particular case. If the court, when it conducts the questioning, declines to ask a question requested by the defendant's counsel, an exception may be noted so that an appellate court can consider the propriety, pertinence and substance of such question. The procedure followed in the present case avoided repetitive questioning without precluding or restricting any inquiry suggested and requested by defendants' counsel. The procedure followed was not violative of G.S. 9-15 (a) or otherwise objectionable, and defendants have failed to show any prejudice on account thereof. Hence, the assignment based on what appears in the record as "DEFENDANTS' EXCEPTION No. 3" is without merit.

Each defendant assigns as error the denial of his motion for judgment as in case of nonsuit. In testing its sufficiency, the evidence must be considered in the light most favorable to the State. Contradictions and discrepancies, even in the State's evidence, are matters for the jury and do not warrant nonsuit. *State v. Murphy*, 280 N.C. 1, 7, 184 S.E. 2d 845, 849 (1971), and cases cited.

Although the State's evidence strongly suggests that Mrs. Hughes, while walking along Pine Log Road, was grabbed,

struck, and taken from the road, and that defendants or one or more of them were involved in these events, there was no evidence sufficient to identify any of defendants until the testimony of Viola Collins and Larry McMillan was introduced, indicating that they observed the three defendants in the area behind the Sherwood Drive-In. The State's case against defendants rests upon what happened there, not upon whether defendants or any of them were involved in taking her to that location.

There was plenary evidence that Dawson raped Mrs. Hughes and is guilty as principal in the first degree. The guilt of Smith and Roseboro turns on the application of the legal principles quoted in the following paragraph:

"All who are present at the place of a crime and are either aiding, abetting, assisting, or advising in its commission, or are present for such purpose to the knowledge of the actual perpetrator, are principals and equally guilty. [Citations.] An aider and abettor is one who advises, counsels, procures, or encourages another to commit a crime. [Citations.] To render one who does not actually participate in the commission of a crime guilty of the offense committed there must be some evidence tending to show that he, by word or deed, gave active encouragement to the perpetrator of the crime or by his conduct made it known to such perpetrator that he was standing by to lend assistance when and if it should become necessary. [Citation.]" *State v. Ham,* 238 N.C. 94, 97, 76 S.E. 2d 346, 348 (1953). Decisions in accord are cited in *State v. Aycoth,* 272 N.C. 48, 51, 157 S.E. 2d 655, 657 (1967).

[3]　There was evidence tending to show that Smith and Roseboro were standing by while Dawson was raping Mrs. Hughes; that they were undertaking to protect Dawson from interference; that each of them obstructed the attempts of Viola Collins and of Larry McMillan to rescue Mrs. Hughes from Dawson; and that the three defendants, together, fled from the scene while Viola Collins was trying to telephone the police. Our preliminary statement sets forth the evidence in detail. When considered in the light most favorable to the State, it was sufficient to support the conviction of Smith and of Roseboro of the crime of rape as principals in the second degree.

[4] Defendants assign as error the conditional exclusion of two black girls from the courtroom, contending the incident was prejudicial to defendants.

The record shows that immediately after Viola Collins testified that she saw Dawson "on top of Mrs. Hughes," the following occurred: "AT THIS point, the proceedings were interrupted by conduct in the Courtroom. The presiding Judge stopped the cross-examination and called two black girls who were sitting in the Courtroom. One in a green dress and the one next to her and told them to get up and get out of the Courtroom and when you decide to behave yourselves, you may come back. That either one or both of the girls laughed and the Judge said wait just a minute, what do you think is so funny. Whereupon the girl in the green dress said, 'I don't know.' Thereupon the Court called the girls up to the area between counsel table and the bench and asked them what is so funny. The girl in the green dress answered, 'Nothing.' The Court told her not to lean against the bench and instructed both girls to get out of the Courtroom and told them that when they decided to behave themselves, they could come back."

In view of the disruptive and unseemly conduct of the two girls, the requirement that they leave the courtroom until they decided to behave themselves was necessary if the trial was to continue under circumstances of judicial decorum and fairness to all concerned. Assuming the girls left the courtroom, it does not appear whether they or either of them returned and behaved themselves. We find no prejudicial error in the manner in which the presiding judge dealt with the inexcusable conduct of the two girls.

[5] Each defendant assigns as error the court's failure to charge the jury "on a lesser crime" and to submit guilt of "a lesser offense" as a permissible verdict.

The State's evidence tended to show that Dawson was guilty of rape as principal in the first degree. There was no evidence from which the jury could find that Dawson committed any included offense of lesser degree. Smith and Roseboro, if guilty at all, were guilty as principals in the second degree of the crime committed by Dawson. There was no evidence that Smith or Roseboro was guilty as a principal in the second degree of any crime except that of rape. Since there was no evi-

State v. Dawson

dence from which the jury could find that any defendant committed an included crime of lesser degree, defendants' assignments of error are without merit. For decisions supporting this conclusion, see the majority and dissenting opinions in *State v. Bryant,* 280 N.C. 551, 187 S.E. 2d 111 (1972).

Defendants' other assignments of error have been fully considered. None discloses prejudicial error or requires discussion.

The evidence discloses that Viola Collins and Larry McMillan acted with courage and compassion when they came to Mrs. Hughes's rescue and prevented the further exploitation and sexual abuse of this helpless woman. Their conduct deserves appreciation and commendation. Apparently, there were others who "passed by on the other side."

Each defendant has failed to show prejudicial error. Therefore, the verdicts and judgments will not be disturbed.

No error.

Justice LAKE, concurring in result. I concur in the result reached by the majority opinion and in all parts of that opinion except the approval of the trial court's denial of the request by counsel for the defendant that he, himself, be permitted to address questions to prospective jurors individually. In my opinion, this was error but, since the defendant did not exhaust his peremptory challenges, no prejudice to the defendant has been shown in this case.

As the majority opinion states, G.S. 9-15(a) provides: "The court, *or any party* to an action, civil or criminal, *shall be allowed,* in selecting the jury, *to make inquiry* as to the fitness and competency of any person to serve as juror * * *." (Emphasis added.) In *State v. Allred,* 275 N.C. 554, 558, 169 S.E. 2d 833, this Court said:

> "In selecting the jury, the court, or any party to an action, civil or criminal, has the right to make inquiry as to the fitness and competency of any person to serve as a juror. G.S. 9-15(a). 'The voir dire examination of jurors is a right secured to the defendant by the statutes and has a definite double purpose: First, to ascertain whether there exist grounds for challenge for cause; and, second, to enable

counsel to exercise intelligently the peremptory challenges allowed by law.' *State v. Brooks,* 57 Mont. 480, 188 P. 942."

Unquestionably, the trial judge has wide discretion in the conduct of the interrogation of prospective jurors so as to avoid needless repetition and waste of time. The requirement, however, that counsel relay through the court all questions to prospective jurors does not have the virtue of saving time except insofar as it may discourage inquiry by making it a tedious and laborious process. The statute seems to contemplate that a party may propound his own questions directly to the jury, assuming the propriety of the question. Such has been the prevailing, if not the universally accepted, practice under the statute in the courts of this State. I see no virtue and some danger in departing from it.