STATE OF NORTH CAROLINA v. RONNIE YOUNG

No. 46

(Filed 6 June 1975)

1. **Jury § 6— sequestration of jurors — individual examination — discretionary matter**

    A motion to examine jurors individually, rather than collectively, is directed to the sound discretion which the trial court possesses for regulating the jury selection process; the trial court in a first degree murder prosecution did not abuse its discretion in denying defendant's motion to sequester all prospective jurors so he could examine the veniremen one at a time in the absence of all other prospective and selected jurors.

2. **Jury § 6— regulation of voir dire inquiry — discretion of trial court**

    Regulation of the manner and extent of the inquiry on *voir dire* rests largely in the trial judge's discretion and a defendant seeking to establish on appeal that the exercise of such discretion constitutes reversible error must show harmful prejudice as well as clear abuse of discretion.

3. **Jury § 6— voir dire examination — purpose**

    The *voir dire* examination of prospective jurors serves a dual purpose: (1) to ascertain whether grounds exists for challenge for cause and (2) to enable counsel to exercise intelligently the peremptory challenges allowed by law.

4. **Criminal Law § 101; Jury § 5— sequestration of prospective jurors — denial proper**

    Defendant failed to show prejudicial error in the trial court's denial of his motion to sequester the prospective jurors and for the right to examine them regarding what they had read or heard about the case where the record failed to show the jury *voir dire* in context and any alleged abuse of discretion or prejudice resulting from the court's denial of defendant's motion.

**5. Jury § 7— challenges — disallowance — preservation of exception**

In order to preserve an exception to the court's rulings on challenges to the polls, the appellant must exhaust his peremptory challenges *and* thereafter undertake to challenge an additional juror.

**6. Criminal Law § 43— photographs of murder victims — admissibility**

The trial court in a first degree murder prosecution did not err in allowing into evidence two color photographs of the victims' bodies, since such photographs were admissible to illustrate and explain the testimony of witnesses.

**7. Criminal Law § 75— confession — admissibility**

Evidence was sufficient to support the trial court's admission of defendant's confession made to the police.

**8. Homicide § 21— first degree murder — confession — sufficiency of evidence**

Evidence which clearly established the brutal and heartless murders of the two victims as they were leaving their place of employment and which linked defendant to weapons used in the killings and placed him at the scene of the crime at the time it was committed, when considered with the confession of defendant, was amply sufficient to repel motions for judgment of nonsuit in a first degree murder prosecution.

Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to death sentence.

DEFENDANT appeals from judgments of *Ervin, J.,* 29 July 1974 Schedule "C" Criminal Session, MECKLENBURG Superior Court.

Defendant was tried upon separate bills of indictment, proper in form, charging him with the first degree murders of Sharon Williams and Steve Charles Helton on 18 August 1973 in Mecklenburg County.

The State's evidence tends to show that on 17 August 1973 Steve Helton and Sharon Williams were employed at the Burger Chef Restaurant in Charlotte, North Carolina. At approximately 11:30 p.m., upon the close of business, they and two other employees left the building and picked up trash for a few minutes. Steve and Sharon then walked to the rear of the establishment to enter Steve's car which was parked there. Stephenie Strawser and Donna Faye Bartlett, the other two employees, went to their automobiles at the front of the parking lot. Stephenie and Donna saw flashes and heard popping noises and a sound "like a cannon," coming from the area around Steve's car. Donna Bartlett saw a lot of smoke and saw three

figures running from behind a dumpster situated near Steve's vehicle. She then saw Steve Helton lying on the ground "trying to get up and brushing his hair back from his head." He was on his back near the left rear wheel of his car. Sharon Williams was on the right front seat slumped over toward the steering wheel.

Dr. Hobart R. Wood, Medical Examiner for Mecklenburg County, examined the bodies at the scene about 12:45 a.m. on 18 August 1973, and pronounced them both dead. He thereafter performed autopsies and testified that Sharon Williams had a large destructive shotgun wound in the right side of the neck and, in addition, a smaller entry type wound made by a large fragment of thin copper jacketing from a bullet. The large wound severed the right common carotid artery running up the side of the neck and practically severed the cervical spine and the spinal cord. Steve Helton had a gunshot wound which entered the base of the left neck toward the shoulder. It severed the cervical spine and spinal cord. The remains of a mutilated jacket and lead core of the bullet were recovered in the upper right back. In the opinion of Dr. Wood, each victim died as a result of gunshot wounds in the neck.

Brenda Agurs and Ellen Barber Gilmore are sisters and live together in Apartment 3 at 2725 Craddock Avenue. They were together on 18 August 1973 at about 10 a.m. when defendant told them he and Richard Gordon had gone to hold up a place "but when they got there there was more people there than was supposed to be, so he had killed some people. He said that he hid behind a green trash can dumpster and when a young man walked out to empty some trash he said [he] hid on behind the trash can so he couldn't see him and said when he went to turn to walk back inside he shot the guy and said there was a girl in a car and when he shot the guy the girl screamed and he said he blasted her, too. He said that there was another guy with him but he was just shooting up in the air. He didn't hit anything. He said he had a high powered rifle. Just me and my sister were present when Ronnie Young made those statements. Her name is Ellen Gilmore."

Brenda Agurs further testified that she had known Ronnie Young about two and one-half months prior to 17 August 1973. Richard Gordon lived next door in Apartment 2 for about a year prior to August 1973 and left some guns in her apartment

closet about two weeks prior to August 17. She then stated: "I saw Ronnie Young with the gun case about two or three days before the Burger Chef case and saw him the Friday night that he brought it back and put it in the closet about 12:00 or 12:30 Friday, August 17."

Ellen Barber Gilmore gave evidence corroborative of the testimony of her sister, and, in addition, testified that: "We asked him why did he kill them and he said that he had been going in and out of the store and they could identify him. He said that white people had been taking from us all our lives and he would kill any of them."

Officer Dale M. Travis testified that on 21 August 1973 at 2 a.m. approximately twenty-five police officers went to 2725 Craddock Avenue and surrounded Apartments 2 and 3. The officers were admitted to Apartment 3 by a black female and a search warrant was read to her. In a closet in the front room they found a 30-30 Marlin rifle (State's Exhibit 22), a sawed-off shotgun, a .22 single barrel rifle and ammunition. Contemporaneously, the defendant was arrested in Apartment 2 by Officer Crump for the murders of Sharon Williams and Steve Helton. Fingerprints and palm prints (State's Exhibit 47) were lifted from the 30-30 Marlin rifle seized in the search. Defendant's fingerprints and palm prints were thereafter taken (State's Exhibit 49) and compared with State's Exhibit 47. Steven Randolph Jones of the SBI, an expert in the identification of fingerprints, testified that he picked out sixteen points of similarity between State's Exhibit 47 and State's Exhibit 49 and that in his opinion the inked impression of defendant's right palm shown on State's Exhibit 49 is identical with the latent palm print, State's Exhibit 47, lifted from the 30-30 Marlin rifle.

Frederick Mark Hurst, Jr. of the SBI, an expert in the field of firearms identification and comparison, testified that in his opinion State's Exhibit 13, a 30-30 Winchester fired cartridge case found approximately five feet from Steve Helton's car on the night of the murders, was fired from State's Exhibit 22. He also testified that State's Exhibit 33, a bullet fragment removed from the body of Sharon Williams, was fired from the same rifle.

After hearing testimony of Officers Dale Travis, H. R. Thompson, Larry Wayne Shank, J. D. Bumgardner and the

defendant, the court made full findings of fact and concluded (1) that defendant was properly advised of his constitutional rights in accordance with *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966); (2) that defendant knowingly waived his right to counsel both orally and in writing; and (3) that defendant freely, understandingly, knowingly and voluntarily, without compulsion, duress, physical abuse or promise of leniency, made a full confession which the State is entitled to offer in evidence against him. The State then offered defendant's confession which, in pertinent part, reads as follows:

> "Me and Richard Gordon were up on the block at Seymour and Steel Creek where a bunch of people were shooting dice. Some of them started talking about going up to the Burger Chef and robbing it. They asked me about pulling the job. I told them 'no.' Me and Richard left and Richard asked me 'do you think we ought to do it?' I said 'no,' and he said 'O.K., forget it'. We went on down to Richard's house at 2725 Craddock Avenue and I started playing cards with Ann, who is Richard's girlfriend. I left and went home about 10:30 and left and went by a girl's house named Pat. Pat told me where the shotgun was hidden in the grass. I got the shotgun and ran and caught up with Richard and Zack. Zack had the rifle; the big rifle that I had ~~stolen~~ gotten (R.Y.) from ~~Roy~~ Ray (R.Y.) Thompson. Richard had the pistol.
>
> We walked on up behind the Burger Chef. We all three stood behind the big dumpster. The light in the place went out. I saw the boy come up to the garbage dumpster and I stepped around to the other side and left Zack and Richard. I started hearing six shots. I ran back around by the other side of the dumpster and Zack was standing in front of the car. I saw Zack shoot at the man by the trunk of his car. I stepped out from behind the dumpster and shot my shotgun at the car. Richard was standing beside the dumpster when I came around. I turned and ran and Richard was right behind me. I heard approximately two more shots. Zack caught up with us on the railroad tracks. The boys up on the block told us the Manager would be parked in the back and if he did not come out with a money bag that they would have made a drop before they closed. The closest one to the car was supposed to get

the money. That would have been Zack. When we got down on the track, Zack hollered and said that there was not any money. I emptied the shell from the shotgun on the railroad track by the junk yard. We went on down to Richard's house and I got some water. We gave the guns to Zack on the front porch at Richard's and he took them next door. I then went home."

Defendant testified as a witness in his own behalf. He said he and Richard Gordon were good friends and often smoked grass and dropped acid. On the night in question defendant had been drinking beer and smoking grass at Gordon's apartment. Gordon asked defendant to accompany him and Zachery McCain to the Burger Chef to get a money bag. Gordon got three guns from a closet, a rifle, a pistol and a shotgun. The three left the apartment together. Defendant had the sawed-off shotgun, McCain had the .32 pistol and Richard Gordon had the 30-30 rifle. They started walking toward the Burger Chef and on arrival stood behind a big green dumpster, each with a weapon in his hand. At that point defendant said:

"I had finally came to myself and I told Richard that I wanted out of it, that I didn't want no part of this that was going to happen. I told him that we were going to get ourselves in trouble. So we started arguing. So I threw the gun down and I told him I was going to run and he told me no, you can't run. . . . He said, 'You run and I am going to kill you.' So about that time a guy came out of the place and he put the girl in the car, I was standing beside Richard and Richard ran around the front of the car and shot him. And the door on the driver's side was open. That is when he shot the girl and ran back over there where I was.

At the time Zachery McCain was on the other side of the garbage can. I can't recall what he was doing. I heard a lot of shots. About that time he ran back around where I was and he had the shotgun in his belt and he said, 'You get up there. You done messed up everything.' Said, 'No, I am going to make you a part of it.' That is when he took the shotgun from his belt and shot. He threw me the shotgun and said, 'Come on and let's run,' and we started running."

Defendant further testified that while they were running he emptied the shell from the shotgun on the railroad track.

They continued on to Richard Gordon's apartment where defendant left the gun and went home. He stated he was arrested on Tuesday morning between 2 and 3 a.m. in Richard Gordon's apartment; that he was upstairs in bed with one Lori Ann Alexander and "my girl friend, Amy Carelock." He said the officers called him "Nigger," kicked him while his arms were handcuffed behind his back, pushed his head and face into the wall, struck him with a flashlight and billy stick and pushed him out of the house. He further stated that an officer later snatched him out of the car and threw him in the mud and again struck him in the head.

Defendant was convicted of the first degree murder of both Steve Helton and Sharon Williams. The death sentence was pronounced in each case, and defendant appealed to the Supreme Court assigning errors discussed in the opinion.

*Rufus L. Edmisten, Attorney General; George W. Boylan, Assistant Attorney General, for the State of North Carolina.*

*George C. Collie, Attorney for defendant appellant.*

HUSKINS, Justice.

Before pleading, defendant moved to quash the bills of indictment on grounds that the death penalty as applied in this State violates the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States. After verdict he moved to arrest judgment on similar grounds. Denial of both motions constitutes defendant's first assignment of error.

Under this assignment defendant argues (1) that he was denied due process because the death penalty was applied to him in an arbitrary, capricious, subjective and selective manner due to freakish exercise of prosecutorial discretion and (2) that the death penalty as applied in North Carolina is unconstitutional *per se.* These contentions have heretofore been considered by this Court and rejected in numerous cases. *See, e.g., State v. Vick,* 287 N.C. 37, 213 S.E. 2d 335 (1975) ; *State v. Armstrong,* 287 N.C. 60, 212 S.E. 2d 894 (1975) ; *State v. Lowery,* 286 N.C. 698, 213 S.E. 2d 255 (1975) ; *State v. Simmons,* 286 N.C. 681, 213 S.E. 2d 280 (1975) ; *State v. Stegmann,* 286 N.C. 638, 213 S.E. 2d 262 (1975) ; *State v. Woods,* 286 N.C. 612, 213 S.E. 2d 214 (1975) ; *State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975) ; *State v. Avery,* 286 N.C. 459, 212 S.E.

2d 142 (1975); *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975); *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974); *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973). Assignment one is overruled.

Prior to the commencement of jury selection defendant moved to sequester all prospective jurors so he could examine the veniremen one at a time in the absence of all other prospective and selected jurors. The trial judge denied the motion and then directed that the jury be selected in the following manner:

" . . . The entire number of jurors who are available will be brought into this courtroom tomorrow morning at 9:30 and the Clerk will read over the names of the entire jury panel at that time in the presence and hearing of the defendant and his counsel.

Immediately the first twelve persons whose names are called will be directed at that time to take seats in the jury box. In other words, we will call the entire panel of jurors one at a time by name with the first twelve being seated in the jury box to my left. As soon as we do that, I will direct that the State will call in the presence and hearing of all the prospective jurors a list of the names of witnesses that the State proposes to call or list of names of witnesses that the State will call. As soon as we complete that process, then I will remove from the courtroom all of the prospective jurors except the twelve who are sitting in the jury box to my left.

The other prospective jurors will be taken to the District Court customarily used, but vacant this week, and will be sequestered in that courtroom under supervision of the Sheriff's office during the process of the jury selection.

With regard to the twelve in the jury box, the State shall then conduct their Voir Dire examination of those twelve and shall make any and all challenges for cause against any of the twelve and it shall then make its peremptory challenge. If the Court shall allow a challenge for cause or if the State shall excuse a juror peremptorily, the Clerk shall call a replacement in the box before the Solicitor completes his examination or challenge of any other of the twelve.

When the State is satisfied with the twelve in the box, the Clerk shall then tender the twelve in the box to the defendant. The defendant shall then conduct his Voir Dire examination of those twelve. The defendant shall then make any challenges for cause against any of the twelve and shall then make any peremptory challenges against any of the twelve. If by reason of cause or peremptorily, a juror shall leave the box during the course of the defense counsel's examination of the jurors, the Clerk shall not immediately call a replacement to the box but shall wait until the defendant shall state to the Court that he is satisfied with the remainder of the twelve which remain.

After they have been tendered him by the State, if there have been no members of the twelve removed, the Clerk shall proceed to empanel the jury. If anyone for cause or peremptorily have been removed by the defendant, then after the remaining ones have been stated by the defendant to be satisfactory with him, he shall have replacements called for the vacant seats by the Clerk from the panel at large. Then the State must by virtue of G.S. 9-21(b) be allowed to first examine any and all replacement jurors in the box and make challenges both for cause and peremptorily before the defendant shall be allowed to question any replacement. At all times the State is the party to be first satisfied with any given juror before he shall be ever tendered to the defendant. Those jurors who shall have been tendered to a defendant by the State and not challenged for cause or peremptorily by the defendant, may not thereafter be challenged by the defendant. The defendant may not stand any at the foot of the list or make any reservation of any challenge to await and see who the replacement shall be. Once the defendant has passed, he has passed for all purposes."

In accordance with this procedure, the clerk called twelve prospective jurors who took their seats in the jury box and the State proceeded with its voir dire examination. In questioning the jurors the district attorney asked the entire panel whether any of them had read anything in the paper about the case "back in the summer of 1973." Ten of the jurors indicated in the affirmative. "At this point," defendant again moved to sequester the prospective jurors and for the right to examine them regarding what they had read or heard about the case.

The court overruled the motion and instructed the jurors that he would permit examination as to whether any of them, or any of the other prospective jurors, had formed or expressed an opinion about the case. The record then recites:

> " . . . The Court further instructed the prospective jurors not, under any circumstances, give up . [sic] the benefit of your opinion concerning what you have read or heard if you have one. In other words, don't tell us anything about what your opinion might or might not be. The sole purpose of this is simply to ascertain whether you have any opinion or not. We don't want to know what that opinion is and do not express in any way any opinion about this matter if you have an opinion. Simply indicate that you have formed such an opinion and stop at that point."

The record recites at this point that defendant thereafter exercised all of his peremptory challenges before the panel of twelve jurors was selected, but it is completely silent in regard to the actual examination of the jurors, the number and identity of those excused for cause, and the identity of those excused peremptorily.

Defendant objected and excepted to the foregoing proceedings in apt time and bases his second assignment of error thereon. He argues the trial court erred in denying his motion to sequester prospective jurors and his motion to examine the jurors concerning what they had read and heard about this case.

[1] Matters relating to the actual conduct of a criminal trial are left largely to the sound discretion of the trial judge so long as the defendant's rights are scrupulously afforded him. *State v. Perry,* 277 N.C. 174, 176 S.E. 2d 729 (1970). Therefore, a motion to examine jurors individually, rather than collectively, is directed to the sound discretion which the trial court possesses for regulating the jury selection process. *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974) ; 47 Am. Jur. 2d, Jury § 197 (1969) ; Annot., Voir Dire—Personal Examination, 73 A.L.R. 2d 1187, 1203 (1960). *Compare State v. Roseboro,* 276 N.C. 185, 171 S.E. 2d 886 (1970), *rev'd as to death penalty,* 403 U.S. 948, 29 L.Ed. 2d 860, 91 S.Ct. 2289 (1971), *with State v. Perry, supra.*

Here, the jury was selected in the manner previously approved by this Court in various cases, including *State v. Dawson,* 281 N.C. 645, 190 S.E. 2d 196 (1972) ; *State v. Cutshall,* 281

N.C. 588, 189 S.E. 2d 176 (1972) ; *State v. Atkinson,* 278 N.C. 168, 179 S.E. 2d 410, *rev'd as to death penalty,* 403 U.S. 948, 29 L.Ed. 2d 861, 91 S.Ct. 2292 (1971) ; *State v. Perry, supra; State v. McNeil,* 277 N.C. 162, 176 S.E. 2d 732 (1970), *cert. denied* 401 U.S. 962, 28 L.Ed. 2d 245, 91 S.Ct. 967 (1971). Accordingly, there was no abuse of discretion in denying defendant's motion to sequester prospective jurors.

Defendant's second contention under this assignment is that the court's ruling on his motion to examine jurors concerning what they had read or heard about the case denied him the opportunity to ascertain whether grounds existed for challenge for cause and the opportunity to exercise his peremptory challenges intelligently.

The right to make inquiry on voir dire examination as to the fitness and competency of a prospective juror is secured by G.S. 9-15(a). In regard to this phase of the trial, the presiding judge has the duty to supervise the examination of prospective jurors and to decide all questions relating to their competency. G.S. 9-14 (1969) ; *State v. Carey,* 285 N.C. 497, 206 S.E. 2d 213 (1974) ; *State v. Harris,* 283 N.C. 46, 194 S.E. 2d 796, *cert. denied* 414 U.S. 850, 38 L.Ed. 2d 99, 94 S.Ct. 143 (1973).

[2] Regulation of the manner and the extent of the inquiry on voir dire rests largely in the trial judge's discretion. *State v. Bryant,* 282 N.C. 92, 191 S.E. 2d 745 (1972), *cert. denied* 410 U.S. 987, 36 L.Ed. 2d 184, 93 S.Ct. 1516 (1973). A defendant seeking to establish on appeal that the exercise of such discretion constitutes reversible error must show harmful prejudice as well as clear abuse of discretion. *State v. Moses,* 272 N.C. 509, 158 S.E. 2d 617 (1968) ; *see State v. Higgs,* 143 Conn. 138, 120 A. 2d 152 (1956) ; *State v. Rasor,* 168 S.C. 221, 167 S.E. 396 (1933) ; 47 Am. Jur. 2d, Jury § 212 (1969).

[3] The voir dire examination of prospective jurors serves a dual purpose: (1) to ascertain whether grounds exist for challenge for cause and (2) to enable counsel to exercise intelligently the peremptory challenges allowed by law. *State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833 (1969). "Obviously, prospective jurors may be asked questions which will elicit information not, per se, a ground for challenge in order that the party, propounding the question, may exercise intelligently his or its peremptory challenges." *State v. Jarrette, supra.*

[4]   When the foregoing principles are applied to this case, the proposed question, taken alone, seemingly would be within legitimate bounds of inquiry. However, the record before us fails to show the jury voir dire in context and any alleged abuse of discretion or prejudice resulting from the court's denial of defendant's motion. We perceive no prejudicial error in the trial court's action.

It is elementary that an appellate court must have in the record before it a complete account of the action by the trial court of which the appellant complains. An appellate court is not required to, and should not, assume error by the trial judge when none appears on the record before the appellate court. *State v. Williams,* 274 N.C. 328, 163 S.E. 2d 353 (1968) ; *State v. Duncan,* 270 N.C. 241, 154 S.E. 2d 53 (1967).

The court's outlined procedure for the selection of the jury provided that defendant could conduct the voir dire examination of the twelve jurors remaining in the box after the State had examined them to its satisfaction and after the clerk had tendered them to defendant. That is the usual sequence in jury selection. Here, however, defendant's motion was made during the State's examination and defendant sought the *immediate* right to examine the jurors before the State had concluded its examination. The question which defendant proposed to ask— "What it was that they had read or heard about this case?"— could not reasonably be expected to elicit information bearing on a challenge for cause since the court allowed questioning as to any ultimate opinion the jurors had formed as a result of what they had read or heard. *See State v. Jarrette, supra* at 640-41, 202 S.E. 2d at 732. Under these circumstances, there was no necessity for the court to allow interruption of the State's examination for such questioning by defense counsel. Even so, in an abundance of caution and fairness, the court allowed defense counsel *at that time* to question the jurors as to whether they had formed an opinion about the case.

The State contends that the trial court allowed every prospective juror who, for whatever reason, had formed any opinion about the case to be challenged for cause on that ground without further inquiry concerning the nature of the opinion or how strongly it was held. The contention seems logical in light of the procedure adopted by the trial court, but the record fails to support it. Nor will the record support defendant's argument that the court unduly limited his right to examine the jurors as

State v. Young

to their fitness and competency. In fact, the record fails to show (1) what transpired *at that time* during defendant's questioning of the jurors concerning their opinions, if they had one, (2) what transpired *later, i.e.,* during defendant's questioning of the jurors on voir dire after they had been passed by the State and tendered to him, (3) whether defense counsel posed any questions to the jurors which were disallowed by the court, or (4) whether any prospective juror who had read or heard anything about the case ultimately served as one of the twelve. The record gives us nothing tangible to support a finding that defendant was prejudiced by the jury selection process. Nothing else appearing, the selection process imports regularity. "After all, there is a presumption of regularity in the trial. In order to overcome that presumption it is necessary for matters constituting material and reversible error to be made to appear in the case on appeal." *State v. Sanders,* 280 N.C. 67, 185 S.E. 2d 137 (1971) ; *accord, State v. Hilton,* 271 N.C. 456, 156 S.E. 2d 833 (1967).

[5] We further note that in order to preserve an exception to the court's rulings on challenges to the polls the appellant must exhaust his peremptory challenges *and* thereafter undertake to challenge an additional juror. *State v. Woods,* 286 N.C. 612, 213 S.E. 2d 214 (1975) ; *State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833 (1969). Justice Stacy (later Chief Justice) explained this rule in *State v. Levy,* 187 N.C. 581, 122 S.E. 386 (1924), as follows :

> "It should be observed that no ruling relating to the qualification of jurors and growing out of challenges to the polls will be reviewed on appeal, unless the appellant has exhausted his peremptory challenges and then undertakes to challenge another juror. [Citation omitted.] His right is not to select but to reject jurors; and if the jury as drawn be fair and impartial, the complaining party would be entitled to no more upon a new trial, and this he has already had on the first trial. [Citations omitted.] Hence the ruling, even if erroneous, would be harmless."

In a criminal appeal the burden is on the appellant to show both error and prejudice. *State v. Partlow,* 272 N.C. 60, 157 S.E. 2d 688 (1967) ; *State v. Phillip,* 261 N.C. 263, 134 S.E. 2d 386, *cert. denied* 377 U.S. 1003, 12 L.Ed. 2d 1052, 84 S.Ct. 1939 (1964). Here, he has shown neither. Defendant's second assignment is overruled.

[6]  Defendant's third assignment asserts error in allowing into evidence two color photographs of the victims' bodies. We find no merit in this assignment. The photographs were admissible to illustrate and explain the testimony of witnesses Kirkpatrick, Catlett, Booth, and Bartlett. They were properly authenticated and the jury was properly instructed that they were admitted for the sole purpose of illustrating and explaining the testimony of the witnesses. They were competent for that purpose. *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974); *State v. Crews,* 284 N.C. 427, 201 S.E. 2d 840 (1974); *State v. Duncan,* 282 N.C. 412, 193 S.E. 2d 65 (1972); *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652, *rev'd as to death penalty* 401 U.S. 1004, 34 L.Ed. 2d 295, 93 S.Ct. 453 (1972); *State v. Doss,* 279 N.C. 413, 183 S.E. 2d 671 (1971), *rev'd as to death penalty* 408 U.S. 939, 33 L.Ed. 2d 762, 92 S.Ct. 2875 (1972); *State v. Atkinson,* 278 N.C. 168, 179 S.E. 2d 410, *rev'd as to death penalty* 403 U.S. 948, 29 L.Ed. 2d 861, 91 S.Ct. 2292 (1971); *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969), *rev'd as to death penalty* 403 U.S. 948, 29 L.Ed. 2d 859, 91 S.Ct. 2283 (1971).

[7]  Defendant next assigns as error the admission, over objection, of the confession which he made to the police. He contends the confession should have been excluded because it is "very reasonable and plausible" to conclude from the evidence received on voir dire (1) that the defendant did not understand the waiver of rights which he signed, (2) that he was promised leniency, (3) that he was too scared or frightened to understand the consequences of his act, and (4) that he lacked the intelligence or mental capacity to comprehend the documents which he signed. We find no merit in this contention.

The trial judge properly excused the jury and heard evidence bearing upon the admissibility of the confession. *State v. Pruitt,* 286 N.C. 442, 212 S.E. 2d 92 (1975); *State v. Bishop,* 272 N.C. 283, 158 S.E. 2d 511 (1968). Based on the evidence thus received, he made extensive findings of fact and conclusions of law supporting admission of the confession. His findings were amply supported by competent evidence and are conclusive on appeal. *State v. Simmons,* 286 N.C. 681, 213 S.E. 2d 280 (1975); *State v. Pruitt, supra; State v. Thompson,* 285 N.C. 181, 203 S.E. 2d 781, *cert. denied* 419 U.S. 867, 42 L.Ed. 2d 104, 95 S.Ct. 123 (1974); *State v. Stepney,* 280 N.C. 306, 185 S.E. 2d 844 (1972). Only defendant's own testimony supports his conten-

tions under this assignment. The trial court was not required to accept that testimony and disbelieve other competent evidence. This assignment is overruled.

[8]  Defendant finally contends the court should have allowed his motion for judgment of nonsuit made at the close of the State's evidence. He argues that the evidence *aliunde* the confession was insufficient to establish that the crime charged was committed by him. This constitutes defendant's fifth assignment of error.

When the State offers evidence of the *corpus delicti* in addition to defendant's extrajudicial confessions, defendant's motion to nonsuit is correctly denied. *State v. Moore,* 275 N.C. 141, 166 S.E. 2d 53 (1969) ; *State v. Elam,* 263 N.C. 273, 139 S.E. 2d 601 (1965). "A conviction cannot be had on the extrajudicial confession of the defendant, unless corroborated by proof *aliunde* of the *corpus delicti.* Full, direct, and positive evidence, however, of the *corpus delicti* is not indispensable. A confession will be sufficient if there be such extrinsic corroborative circumstances, as will, *when taken in connection with the confession,* establish the prisoner's guilt in the minds of the jury beyond a reasonable doubt." *State v. Whittemore,* 255 N.C. 583, 122 S.E. 2d 396 (1961) ; *accord, State v. Jenerett,* 281 N.C. 81, 187 S.E. 2d 735 (1972).

Here, the State's evidence, *aliunde* the confession, clearly establishes the brutal and heartless murders of the two victims as they were leaving their place of employment. The evidence further links defendant to weapons used in the killings and places him at the scene of the crime at the time it was committed. This evidence, when considered with the confession of defendant, is amply sufficient to repel the motions for judgment of nonsuit. *State v. Clyburn,* 273 N.C. 284, 159 S.E. 2d 868 (1968) ; *State v. Bishop,* 272 N.C. 283, 158 S.E. 2d 511 (1968). Assignment five is therefore overruled.

We have carefully examined the entire record and find no prejudicial error in the trial. The verdict and judgment in each case must therefore be upheld.

No error.

Chief Justice SHARP dissenting as to the death sentence:

The murders for which defendant was convicted occurred on 18 August 1973, a date between 18 January 1973, the day of the decision in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19, and 8 April 1974, the day on which the General Assembly rewrote G.S. 14-21 by the enactment of Chapter 1201 of the Session Laws of 1973. For the reasons stated in the dissenting opinion in *State v. Jarrette,* 284 N.C. 625, 666 *et seq.,* 202 S.E. 2d 721, 747 *et seq.* (1974), I dissent as to the death sentence imposed upon defendant by the court below and vote to remand for the imposition of a sentence of life imprisonment.

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 437, 212 S.E. 2d 113, 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 439, 212 S.E. 2d 113, 121 (1975), other than those relating to the effect of Section 8 of Chapter 1201 of the 1973 Session Laws.