STATE OF NORTH CAROLINA v. ALBERT CROWDER, JR.

No. 7

(Filed 13 March 1974)

1. Constitutional Law § 29; Jury § 7; Criminal Law § 135— selection of jury — inquiries as to death penalty views

Prospective jurors in a capital case may be asked whether they have moral or religious scruples against capital punishment and, if so, whether they are willing to consider all of the penalties provided by law or are irrevocably committed to vote against the death penalty regardless of the facts and circumstances that might be revealed by the evidence.

2. Criminal Law § 42— .38 caliber pistol — admissibility in murder case

The trial court properly allowed a .38 caliber pistol into evidence in a first degree murder prosecution where the evidence tended to show that the victim was shot, the defendant told the victim he had "a .38" for her just before the shot was fired, an eyewitness testified that the pistol resembled the one he saw defendant use, and the pistol, which contained four full rounds and one empty cartridge, was found 1½ hours after the shooting some four to six parking spaces from the spot where deceased was shot.

3. Criminal Law § 96— evidence withdrawn from jury consideration — no prejudice

Where the sister of the victim in a first degree murder case testified that deceased met defendant in Caledonia in prison, prejudice, if any, in admission of the evidence was removed when the evidence was withdrawn and the jury instructed not to consider it.

4. Criminal Law § 43; Homicide § 20— photograph of murder victim's body — admissibility

A photograph of the nude body of deceased taken in the morgue was properly admitted in a first degree murder case to illustrate the testimony of an officer of the City-County Identification Bureau.

5. Criminal Law § 57— gunshot residue wipings — qualification of SBI agent to take

An SBI agent was qualified to take gunshot wipings from defendant's hands where the procedure was not "highly technical," the agent's background included technical police investigatory work and the agent had been given personal instruction by a chemist who was expert in the field of gunshot residue tests.

6. Criminal Law § 57— gunshot residue wiping tests — competency of evidence

   Where the procedure that an SBI agent testified he followed in taking gunshot wipings from defendant's hands was essentially the same as the procedure contained in the instruction sheet from a wiping kit which was read to the jury by an SBI chemist who wrote the instructions, defendant was not prejudiced, though the instruction sheet accepted into evidence may not have been the same sheet used by the agent in taking wipings from defendant's hands.

7. Criminal Law § 57— gunshot residue wiping tests — reliability — admissibility

   Gunshot residue wiping tests which used flameless atomic absorption spectrophotometry produced results which were sufficiently reliable to be admitted into evidence in defendant's first degree murder prosecution.

8. Constitutional Law § 36; Criminal Law § 135; Homicide § 31— first degree murder — death penalty proper

   In this jurisdiction the penalty for murder in the first degree committed after 18 January 1973 is death, and that penalty is neither cruel nor inhuman in a constitutional sense.

   Chief Justice BOBBITT and Justices HIGGINS and SHARP dissenting as to death sentence.

DEFENDANT appeals from Judgment of *Martin, J.,* First July, 1973 Assigned Criminal Session, WAKE Superior Court.

Defendant was tried upon a bill of indictment, proper in form, charging that on 4 March 1973, with malice aforethought, he did kill and murder Peggy Ann Bryant.

The State offered evidence tending to show that on the night of 4 March 1973 defendant was at King's Lounge, a Raleigh tavern. The deceased Peggy Ann Bryant, defendant's girl friend, arrived in an auto with her two sisters and two other girls. Peggy called defendant to the car where an argument ensued following which defendant went back into the tavern. Shortly thereafter defendant came out of King's Lounge, called Peggy, and they went around the corner of the building. They returned in a few minutes and defendant reentered the lounge while Peggy talked to the other girls at the car in the parking lot. When defendant came out of King's Lounge the second time, Peggy left the car and again followed defendant to the side of the tavern. What then occurred is described by Milton Hunter, an eyewitness, in the following paragraph.

Hunter had parked his car in a parking space at the corner of King's Lounge and thus could see down two sides of the

building and was seated on the hood of his car drinking beer and talking with an acquaintance, a soldier named Edward Patterson. He observed defendant and Peggy Ann Bryant beside the building. He heard defendant call Peggy a vulgar name and say: "I got something for you, I have got your goddamn birthday present right here." Peggy said: "What is it?" Defendant replied: "This .38 here." According to the witness Hunter, the pistol was not in defendant's hand at the time. "He reached up this way and got up beside of his stomach and got it." Defendant then shot Peggy Ann Bryant in the face, began hitting the hood of the car next to Hunter's car, and yelled for an ambulance, saying "someone from the highway over there shot my girl friend." Peggy Ann Bryant was taken by ambulance to the hospital where she died as a result of extensive injury to the brain caused by a bullet which had entered directly above the left eye and penetrated the brain. An autopsy was performed and two lead fragments lodged in the back of the head were removed.

Numerous other witnesses testified that they saw Peggy Ann Bryant accompanying the defendant to the side of the building and then heard a shot.

Officer Hinton testified that the death weapon was not immediately found but approximately an hour and a half later, after returning from the hospital, he made a thorough search of the parking lot and found a .38 caliber Smith and Wesson revolver with a two-inch barrel approximately four to six parking spaces from where Peggy Ann Bryant was lying. The pistol was loaded at the time and contained four full rounds and one spent round.

Gunshot wipings taken from the back of defendant's right hand and the palm of his left hand showed significant concentrations of barium, antimony and lead, particularly on the back of the right hand between the thumb and forefinger. This indicated that he had recently fired a gun according to the testimony of R. D. Cone, a forensic chemist and an expert in the taking and interpretation of gunshot residue tests.

Glen Glesne, a laboratory analyst in the field of chemisty, blood and body fluids, did an analysis of the blood of Peggy Ann Bryant and determined that it belonged to Group A. Reddish colored stains on the shoes and trousers of defendant were

State v. Crowder

analyzed and found to be blood of human origin which demonstrated the A blood grouping factor.

Defendant offered no evidence. The jury convicted defendant of murder in the first degree and he was sentenced to death. His appeal to this Court presents for review the assignments of error discussed in the opinion.

*Robert Morgan, Attorney General; T. Buie Costen and Rafford E. Jones, Assistant Attorneys General, for the State of North Carolina.*

*Gerald L. Bass, attorney for defendant appellant; David E. Kendall of the NAACP Legal Defense Fund, attorney for defendant appellant.*

HUSKINS, Justice.

[1] Over defendant's objection the solicitor was permitted to ask each prospective juror the following question: "Do you have any moral or religious scruples or beliefs against capital punishment?" Ten jurors answered no, one answered yes but said that after hearing all the evidence and listening to the case she could consider a verdict of guilty in a capital case, and one said it would depend upon the circumstances. The record shows that no juror was excused for cause by either the solicitor or defense counsel. Defendant contends the trial court erred in allowing the jurors to be questioned concerning their views on capital punishment. This constitutes defendant's first assignment of error.

With respect to jury selections in capital cases, *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968), establishes two things: (1) veniremen may not be challenged for cause simply because they voice general objections to the death penalty or express conscientious or religious scruples against its infliction; and (2) veniremen who are unwilling to consider all of the penalties provided by law and who are irrevocably committed, before the trial has begun, to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the trial may be challenged for cause on that ground.

Since the decision in *Witherspoon* this Court has held in many cases that prospective jurors in a capital case may be asked whether they have moral or religious scruples against

capital punishment; if so, whether they are willing to consider all of the penalties provided by law, or are irrevocably committed to vote against the death penalty regardless of the facts and circumstances that might be revealed by the evidence. *See e.g., State v. Washington,* 283 N.C. 175, 195 S.E. 2d 534 (1973) ; *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652 (1972) ; *State v. Doss,* 279 N.C. 413, 183 S.E. 2d 671 (1971) ; *State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487 (1970) ; *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969) ; *State v. Peele,* 274 N.C. 106, 161 S.E. 2d 568 (1968).

In order to insure a fair trial before an unbiased jury, it is entirely proper in a capital case for both the State and the defendant to make appropriate inquiry concerning a prospective juror's moral or religious scruples, beliefs, and attitudes toward capital punishment. Defendant's first assignment of error is overruled.

[2]  A .38 Smith and Wesson pistol was identified as State's Exhibit 2 and admitted into evidence over defendant's objection. Defendant contends the pistol was improperly admitted since it was never identified as the murder weapon. This constitutes defendant's second assignment of error.

As a general rule weapons may be admitted in evidence "where there is evidence tending to show that they were used in the commission of a crime." *State v. Wilson,* 280 N.C. 674, 187 S.E. 2d 22 (1972). Any article shown by the evidence to have been used in connection with the commission of the crime charged is competent and properly admitted into evidence. *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190 (1968). "So far as the North Carolina decisions go, any object which has a relevant connection with the case is admissible in evidence, in both civil and criminal trials. Thus, weapons may be admitted where there is evidence tending to show that they were used in the commission of a crime or in defense against an assault." 1 Stansbury's North Carolina Evidence § 118 (Brandis rev. 1973).

Applying these legal principles to the evidence in this case, we hold that State's Exhibit 2 was properly admitted. Sergeant Hinton identified State's Exhibit 2 as the pistol he found in the parking lot at King's Lounge about one and one-half hours after the shooting. Officer Holder testified that the entire parking area was not searched immediately after the shooting due to crowd control problems and the large number of vehicles in

the area. The pistol, which contained four full rounds and one empty cartridge, was found approximately four to six parking spaces from the spot where the deceased was shot. Milton Hunter, an eyewitness to the shooting, testified that defendant told deceased he had "a .38" for her just before the shot was fired; that he didn't see what happened to the gun afterwards; and that State's Exhibit 2 resembles the gun he saw defendant use. Deborah Bryant, when shown State's Exhibit 2, testified: "I have seen defendant Albert Crowder with a pistol before. It was similar to that one over at his house one night. It looked like that one to me. It was about a week before March 4." All this evidence tends to show a relevant connection between State's Exhibit 2 and the murder of Peggy Ann Bryant. The weapon was properly admitted. Defendant's second assignment of error is overruled.

[3] Jacquelyn Otelie Bryant, sister of the deceased, testified that defendant had been dating the deceased from July or August 1972 until the date she was shot. The solicitor then asked the witness if she knew of her own knowledge where defendant and deceased met. Defendant's objection to that question was overruled and the witness replied: "She met him in Caledonia in prison." Objection was then sustained and the jury was instructed not to consider the answer. At defendant's request the jury was excused and defendant moved for mistrial on the ground that the answer was so highly prejudicial the error could not be cured by the court's instructions. Denial of this motion constitutes defendant's third assignment of error.

Defendant relies on *State v. Aycoth,* 270 N.C. 270, 154 S.E. 2d 59 (1967), in support of his motion for mistrial. There, Aycoth and his co-defendant John Shadrick were on trial for armed robbery. Deputy Sheriff Fowler was asked if he knew who owned the automobile which was in Aycoth's possession at the time of his arrest. The deputy replied that at the time Aycoth had been arrested on another charge he had said it was his car, and then added: "His wife asked me to go search the car and see if I could find some articles that was left in the car sitting in the yard *when he was indicted for murder.*" (Emphasis added.) Defendant's objection and motion to strike were allowed, and the court instructed the jury not to consider what defendant's wife had said. Defendant's motion for a mistrial was denied. This Court awarded a new trial, saying: "The unresponsive statement of Fowler informed the jury that Aycoth had been

*indicted* for murder. . . . *Subsequent incidents* tend to emphasize rather than dispel the prejudicial effect of Fowler's testimony. Shadrick testified the arresting officer answered his inquiry as to why he was being arrested by saying, 'Running around with Aycoth is enough.' Too, the solicitor, in cross-examining Shadrick, asked (1) whether Shadrick had become acquainted with Aycoth in prison, and (2) whether Shadrick knew Aycoth while Shadrick was in prison. . . . Being of the opinion the incompetent evidence to the effect Aycoth had been or was under indictment for murder was of such serious nature that its prejudicial effect was not erased by the court's quoted instruction, we are constrained to hold that Aycoth's motion for a mistrial should have been granted." (Emphasis added.)

Ordinarily, where objectionable evidence is withdrawn and the jury instructed not to consider it no error is committed. *State v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686 (1947). The rule is aptly stated in *State v. Strickland,* 229 N.C. 201, 49 S.E. 2d 469 (1948), as follows: "In appraising the effect of incompetent evidence once admitted and afterwards withdrawn, the Court will look to the nature of the evidence and its probable influence upon the minds of the jury in reaching a verdict. In some instances because of the serious character and gravity of the incompetent evidence and the obvious difficulty in erasing it from the mind, the court has held to the opinion that a subsequent withdrawal did not cure the error. But in other cases the trial courts have freely exercised the privilege, which is not only a matter of custom but almost a matter of necessity in the supervision of a lengthy trial. Ordinarily where the evidence is withdrawn no error is committed." (Citations omitted.)

It is readily apparent that substantial differences distinguish this case from *Aycoth.* In the latter, the objectionable statement was that Aycoth had been *indicted* for murder. Here, the statement was only that defendant had met deceased in Caledonia in prison. While the statement does suggest that defendant may have been in prison, it has other connotations as well: Who was in prison—defendant, deceased, or both? Furthermore, no *subsequent events* tended to emphasize this aspect of the matter. In fact, the subject was not mentioned again. This evidence, therefore, may not be deemed so inherently prejudicial that its initial impact could not be erased by the judge's prompt instruction: "Ladies and gentlemen of the jury, do not consider the answer to that question."

"[O]ur system for the administration of justice through trial by jury is based upon the assumption that the trial jurors are men of character and sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so." *State v. Ray,* 212 N.C. 725, 194 S.E. 482 (1938). We hold that the prejudicial effect, if any, of the evidence under discussion was removed when that evidence was withdrawn and the jury instructed not to consider it. This accords with recent decisions of this Court, including *State v. Moore,* 276 N.C. 142, 171 S.E. 2d 453 (1970), and *State v. Self,* 280 N.C. 665, 187 S.E. 2d 93 (1972). Moreover, the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the stricken evidence is so insignificant by comparison, that the occurrence complained of in this assignment was harmless beyond a reasonable doubt. Defendant's third assignment of error is overruled.

[4] A photograph of the nude body of deceased taken in the morgue was admitted over objection to illustrate the testimony of Officer Holder of the City-County Identification Bureau. Defendant contends this photograph was inflammatory and prejudicial, and its admission constitutes his fourth assignment of error.

Photographs are admissible in this State to illustrate the testimony of a witness, and their admission for that purpose under proper limiting instructions is not error. *State v. Duncan,* 282 N.C. 412, 193 S.E. 2d 65 (1972) ; *State v. Cutshall,* 278 N.C. 334, 180 S.E. 2d 745 (1971) ; *State v. Atkinson,* 278 N.C. 168, 179 S.E. 2d 410 (1971) ; *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824 (1948). *See generally* 1 Stansbury's North Carolina Evidence § 34 (Brandis rev. 1973).

The fact that a photograph may depict a horrible, gruesome or revolting scene, indicating a vicious, calculated act of cruelty, malice or lust, does not render it incompetent. When such photograph is properly authenticated as a correct portrayal of conditions observed and related by the witness who uses it to illustrate his testimony, it is admissible for that purpose. *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969) ; *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10 (1967). The photograph having been used in accordance with the rule, defendant's fourth assignment is without merit and is overruled.

[5] Defendant's fifth, sixth and seventh assignments of error are addressed to evidence concerning gunshot wipings and

the gunshot residue test based thereon. The fifth assignment presents the question whether SBI Agent Sampson, who secured the wipings, was qualified to take them.

Lee Edward Sampson, a Special Agent with the State Bureau of Investigation, took gunshot wipings from defendant's hands during the early morning hours of 5 March 1973. This agent testified that in taking the wipings he used the kit supplied by the SBI Chemical Laboratory and followed the instructions and the procedures contained in that kit.

The record shows that Agent Sampson had two years of college training, had worked for the Federal Bureau of Investigation in its Fingerprint Identification Division for one year and had been an agent with the State Bureau of Investigation for two years and five months at the time he took the wipings. He had been personally instructed in the procedure to be followed by R. D. Cone, the SBI chemist who wrote the instructions contained in all gunshot residue wiping kits used by the SBI.

The procedure for taking the wipings is not "highly technical" as defendant contends. It is a relatively simple matter to follow the instructions, take the wipings, and turn them over to a qualified chemist for analysis and testing. That is all Agent Sampson did, and he was qualified by training and experience to perform that simple task. His background in technical police investigatory work and his personal instruction by a chemist who was expert in the field of gunshot residue tests insured the exercise on Agent Sampson's part of the utmost care in taking the wipings. Defendant's fifth assignment is without merit.

[6] Defendant's sixth assignment asserts error by the court in accepting into evidence an instruction sheet contained in a gunshot wiping kit without evidence that it was in fact the same sheet used by Agent Sampson in taking the wipings from defendant's hands. R. D. Cone, a forensic chemist for the SBI Chemical Laboratory with a Bachelor of Science Degree from North Carolina State University and a Master of Science Degree from Michigan State University, and with fifty semester hours of chemistry with major emphasis of study in the area of microbiology and biochemistry, testified that he authored the instructions placed in all SBI gunshot residue wiping kits. After outlining the procedure followed in taking a wiping, he identified a document as an accurate copy of the instructions contained in

the kits. Then, over objection, he read the instructions to the jury. Defendant contends there was no evidence that it was the same instruction sheet used by Agent Sampson in taking the wipings and, under the best evidence rule, it was error to allow its introduction into evidence.

The instructions, in pertinent part, read as follows:

"Instructions for collecting gunshot residue. North Carolina State Bureau of Investigation, Raleigh, North Carolina. The following procedure should be used to swab surfaces suspected of containing gunshot residue with the kit supplied by the North Carolina State Bureau of Investigation Chemical Laboratory.

Number 1. Thoroughly wash your hands with soap and water and dry them with a clean towel prior to doing the wiping for gunshot residue.

Number 2. Remove one of the cotton swabs from the plastic zip-lock bag and moisten it with four drops of two percent hydrochloric acid.

Number 3. Use the moistened swab and thoroughly swab the back of the left hand including the back of the fingers.

Number 4. Place the used swab into one of the clean zip-lock plastic bags. Seal the bag and label it in the following manner: a. Location of wiping (left back, right palm, etc.) b. Name of suspect. c. Date of wiping. d. Your identification mark.

Number 5. Using three additional swabs, moisten each one individually as in Step 2 and swab the left palm, right back, and right palm, respectively as in Step 3. These swabs should be placed in separate zip-lock bags and treated as in Step 4.

Note: If at any time during the wiping procedure the hand of the wiper should come in contact with the cotton end of the swab or the suspect's hands, the hands should be thoroughly washed in soap and water before the next swab is used. In cases where the same person is wiping the hands of more than one suspect, it is necessary to wash your hands between doing each person.

Number 6. Moisten one of the swabs with four drops of two percent hydrochloric acid and immediately place it in a separate zip-lock plastic bag. This bag should be labeled 'control' as the swab will be analyzed to determine the purity of the materials used to collect the gunshot residue.

Number 7. Swab the inside of the cartridge casing (if available) with a cotton swab moistened with four drops of two percent hydrochloric acid and handle it as in Step 4. This step is particularly important since some types of ammunition do not contain antimony in their primer.

Note: It is advisable not to handle the cartridge casing until the other wipings have been completed. And there is an asterisk for the footnote below this.

When weapons and/or fired cartridge casings are being submitted to the firearms laboratory, do not follow Step 7. In these cases, the chemical laboratory will make a cartridge case wiping in the firearms laboratory. Indicate on the evidence sheet when this evidence has been submitted to the firearms laboratory.

Item Number 8. Fill out the attached evidence sheets completely and enclose them in the mailing envelope with the wipings. The information on these sheets should include the type of weapon involved, the caliber and manufacturer of the ammunition, the condition of the weapon, and the amount of time elapsed between the firing of the weapon and the wiping of the suspect's hands.

Nine. Seal all of the plastic bags used in the self-addressed envelope and mail them by first class mail. The envelope should be marked on the outside 'Attention Chemical Laboratory — Gunshot Residue.'

Number 10. An official report will be mailed to the requesting officer within a reasonable period of time. If rush results are needed, this should be indicated by a personal telephone call to the chemical laboratory."

The procedure Agent Sampson testified he followed in taking the wipings and the procedure contained in the instruction sheet read to the jury by SBI Chemist Cone are essentially the same. Under these circumstances we need not decide whether defendant's technical objection to the introduction of the in-

struction sheet is sound. The record clearly demonstrates that defendant was not prejudiced in the slightest by the introduction of the instruction sheet into evidence and for that reason his sixth assignment of error is overruled.

[7] Defendant contends that scientific tests conducted on gunshot residue wipings are speculative and highly unreliable and that the court erred in allowing R. D. Cone to testify concerning such tests. This constitutes defendant's seventh assignment of error.

SBI Chemist Cone testified that, using flameless atomic absorption spectrophotometry, he personally analyzed the gunshot residue wipings taken by Agent Sampson from defendant's hands to determine whether they contained barium, antimony and lead. This analysis showed "significant concentrations" of all three elements in the wipings taken from the back of defendant's right hand and the palm of his left hand. Based on these test results, Mr. Cone testified that in his opinion "the subject could have handled and fired a gun."

Scientific tests of this nature are competent only when shown to be reliable. The record shows that Mr. Cone is a man experienced in the field of gunshot residue tests and has, on several occasions, presented technical papers on the subject to various associations of forensic scientists. He testified that only in "very rare circumstances" was it possible for all three of the test elements to be found together in situations in which no gunshot was involved; and that in those rare circumstances the concentrations would be the highest on the palms of the hands. Mr. Cone further noted that in tests performed in his laboratory he found that when these elements appeared on the hands of persons who had not fired or handled a gun, "they were always present in concentrations which were different than what you would normally expect to find on the hand of a person who has fired a gun." With respect to the tests that were performed on the wipings taken from defendant's hands, Mr. Cone testified that the concentrations of barium, antimony and lead were highest on the back of defendant's right hand and were about "[a]verage or middle for a person who has fired a .38 caliber weapon."

Independent research on gunshot residue tests verifies the reliability of this type of test. In a series of tests performed on persons involved in occupations where occupational contamina-

tion of the hands might cause interference with the test procedure, researchers have found that "[n]o false tests were obtained nor failure of tests to detect antimony, barium, and lead were encountered because of occupational contamination of the hands." Harrison and Gilroy, Firearms Discharge Residues, 4 J. For. Sci. 184, 198 (1959). Although chemical reagents were used in the Harrison and Gilroy experiments to test for the presence of firearm discharge residue rather than flameless atomic absorption spectrophotometry, as in this case, the difference does not appear significant. Flameless atomic absorption spectrophotometry appears to be an improvement over the use of chemical reagents because chemical reagents detect only the presence of significant concentrations of the three test elements whereas spectrophotometry can also determine the weight of the elements deposited on the subject's hands.

The crucial concern with tests of this type is that the test could indicate that a subject had fired a handgun when in fact he had not. It was for this reason that many courts rejected the dermal nitrate (paraffin) test. *See Brooke v. People,* 139 Colo. 388, 339 P. 2d 993 (1959); *Born v. State,* 397 P. 2d 924 (Okla. Crim. 1964), *cert. denied,* 379 U.S. 1000 (1965); *Clarke v. State,* 218 Tenn. 259, 402 S.W. 2d 863, *cert. denied,* 385 U.S. 942 (1966). This test proved unreliable because it could not distinguish between nitrates deposited on the hand from the firing of a handgun and nitrates deposited on the hands of persons who had come in contact with such common substances as explosives, fireworks, fertilizers, pharmaceuticals, leguminous plants (peas, beans, alfalfa), and burning tobacco products such as cigarettes. 5 Am. Jur. Proof of Facts, Firearms Identification 119-20 (1960). Apparently because of this fact, participating experts in the 1963 seminar on the scientific aspects of police work conducted by the International Criminal Police unanimously rejected the dermal nitrate test as being without value. Moenssens, Moses and Inbeau, Scientific Evidence in Criminal Cases § 4.12 (1973).

According to the testimony of Mr. Cone, antimony, barium and lead will in "rare circumstances" be found on the hands of persons who have not fired a handgun. Even so, by reason of the location and the level of concentrations of the test elements on the subject's hands he is able to determine the probability, great or small as the case may be, whether the test substances came from the discharge residues of a handgun or from some

other source. In our view, the test employed by Mr. Cone in this case avoids the pitfalls inherent in the dermal nitrate test and demonstrably possesses the degree of reliability required to render it competent. We hold that evidence of the results of the test was properly admitted. The mere fact that such evidence does not exclude every remote possibility of error does not render it incompetent. Moreover, defendant has not been prejudiced by the introduction of the results of the gunshot residue test since an eyewitness to the shooting testified that defendant fired a pistol pointed at the victim's face. Defendant's seventh assignment of error is overruled.

Assignments of error 8, 9, 10 and 11 are based on exceptions to the trial judge's charge to the jury. Defendant asserts in these assignments: (1) that the court violated G.S. 1-180 when it characterized as "boresome" the recapitulation of the evidence; (2) that the court erred in defining deliberation and erroneously instructed with respect to proof thereof; (3) that the charge on the elements of first degree murder was erroneous and confusing; and (4) that the court erroneously invaded the province of the jury in that portion of the charge dealing with the jury's deliberations.

These assignments require no discussion and are overruled. Their total lack of merit is revealed by careful examination of the entire charge.

[8] Defendant contends the death penalty imposed in this case is legally unauthorized and constitutes a cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to the Constitution of the United States. This constitutes his twelfth and final assignment of error.

In an excellent brief, similar in many respects to the *amicus curiae* brief filed by the NAACP Legal and Educational Fund, Inc., in *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974), we are urged to reconsider our decision in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973), and hold that life imprisonment is the sole penalty for the four previously capital crimes in this State—murder, arson, burglary and rape—until the Legislature acts to revise the present statutes dealing with those crimes.

All arguments here, attacking the soundness of our decision in *Waddell* and urging the unconstitutionality of the death

penalty under the Eighth and Fourteenth Amendments, were fully considered in *State v. Jarrette, supra.* Our decision in *Jarrette* reaffirms the holding in *Waddell* and is controlling here. In this jurisdiction the penalty for murder in the first degree committed after 18 January 1973 is death. That penalty is neither cruel nor inhuman in a constitutional sense. Defendant's twelfth assignment of error is overruled.

All the evidence tends to show a senseless, vicious, calculated murder without mitigating circumstances. Having received a fair trial free from prejudicial error, the verdict and judgment must be upheld.

No error.

Chief Justice Bobbitt, Justice Higgins and Justice Sharp dissent as to death sentence and vote to remand for imposition of a sentence of life imprisonment for the reasons stated in the dissenting opinion of Chief Justice Bobbitt in *State v. Jarrette,* 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974).