STATE OF NORTH CAROLINA v. JOHNNY LOWELL THOMAS

No. 104

(Filed 24 January 1978)

**1. Criminal Law § 91.1— motion for continuance—discretion—constitutional right —appellate review**

A motion for continuance is ordinarily addressed to the sound discretion of the trial court, and its ruling thereon is not subject to review absent abuse of discretion; however, if the motion is based on a right guaranteed by the Federal and State constitutions, the question presented is one of law and not of discretion, and the ruling of the trial court is reviewable on appeal.

**2. Criminal Law § 91.6— motion for continuance—EEG examination—no abuse of discretion in denial**

The trial court did not abuse its discretion in the denial of defendant's motion for a continuance so that defendant could undergo an EEG examination to determine whether defendant suffered from reduced impulse control where defendant had had two prior continuances for psychiatric examinations; prior to trial defendant had undergone two psychiatric examinations at Dix Hospital and examinations by a private psychiatrist and a private psychologist; all the doctors who examined defendant had similar opinions regarding his mental condition; and the psychiatrist and psychologist who recommended the EEG stated that it probably would yield no new information.

**3. Criminal Law § 91.6— motion for continuance—EEG examination—denial not violation of constitutional rights**

The denial of defendant's motion for a continuance in order to obtain an EEG examination to determine whether he suffered from reduced impulse control did not deprive defendant of his rights of confrontation and due process, since the "irresistible impulse doctrine" is not recognized in North Carolina, and the examination could not have established an insanity defense.

**4. Jury § 6— motion to examine jurors individually—discretion of court**

A motion to examine jurors individually, rather than collectively, is directed to the sound discretion which the trial court possesses for regulating the jury selection process.

**5. Jury § 6— denial of motion to examine jurors individually**

The trial court did not err in denying a murder defendant's motion to examine each prospective juror separately because of pretrial newspaper publicity where, prior to the voir dire examination, the trial court asked the prospective jurors whether any of them had formed or expressed an opinion about defendant's guilt or innocence; defense counsel and the district attorney stipulated that each juror who served on the jury had stated that he did not know of anything which would prevent him from giving defendant and the State a fair trial; and the three newspaper reports about the crime which were filed with the motion were not inflammatory or biased.

State v. Thomas

6. Jury § 7.6— post-trial motion to examine jurors—knowledge of prior conviction

In this homicide prosecution, the trial court did not abuse its discretion in the denial of defendant's post-trial motion to ask jurors about their knowledge of defendant's previous conviction of another murder and the effect, if any, it may have had upon their deliberations, where defendant had the opportunity to examine each juror on *voir dire* regarding his or her exposure to pretrial publicity about the prior conviction, and defendant failed to exhaust his peremptory challenges.

7. Homicide § 21.1— illustrative photographs

In this homicide prosecution, the trial court properly admitted for illustrative purposes six photographs showing the bloodstained interior of the house where deceased was allegedly stabbed, three photographs depicting the exterior of the house and the street where deceased was stabbed a second time, and four photographs showing bruises on either side of deceased's face, a chest wound, and a wound in the abdomen.

8. Homicide § 20.1— photograph of knife

In this homicide prosecution, a photograph of a butcher knife found in the yard of a home near where deceased was killed was properly admitted to illustrate the testimony of an SBI agent concerning the location of the knife when found and its description.

9. Criminal Law § 42.2; Homicide § 20— identification of knife

In this homicide prosecution, testimony of a witness describing the knife used by defendant to stab deceased and evidence that a freshly bloodstained knife answering this description was found in the yard of a home near the crime scene were sufficient identification of the knife so found to permit its introduction into evidence.

10. Homicide § 21.5— first degree murder—premeditation and deliberation—sufficiency of evidence

There was sufficient evidence of premeditation and deliberation to go to the jury on the question of defendant's guilt of first degree murder of his wife where the State's evidence tended to show that defendant broke into the house occupied by his wife and her son after he had been refused admittance; defendant approached his wife with arms outstretched as if to embrace her, pulled a concealed butcher knife from underneath his shirt and stabbed her; defendant then followed his wife into the yard, and, as she was lying upon the ground, knelt beside her and, without provocation, plunged the knife into her abdomen; and the two stab wounds caused the wife's death almost immediately.

APPEAL by defendant from *Seay, J.*, at the 2 May 1977 Session of SURRY Superior Court.

Upon an indictment, proper in form, defendant was tried and convicted of the first degree murder of Clara Chandler Thomas, and was sentenced to life imprisonment.

The State introduced evidence, summarized as follows:

On 4 October 1976 the defendant was living with his wife, Clara Chandler Thomas, at 130 West Elm Street in Mount Airy. Two of Mrs. Thomas's sons, Ralph Chandler and Michael Chandler, were living with the couple.

On the morning of 4 October 1976, after having slept in her bedroom with defendant, Mrs. Thomas had a black eye and bruise marks about her face, none of which she had the preceding day. On seeing the bruises, Ralph Chandler told defendant that it would be best for him to leave. Defendant did leave that day around noon, carrying certain of his belongings. He returned at five o'clock that afternoon. The front screen door was locked, and Ralph and his mother refused to let him in. Defendant jerked the screen door open and entered the house. He extended his arms and approached Mrs. Thomas as if to hug her. When he was about a foot from Mrs. Thomas, he suddenly pulled a butcher knife from underneath his shirt and stabbed her in the right posterior chest underneath her shoulder blade. Mrs. Thomas fell into the dining room.

Defendant then turned and started swinging the knife at Ralph. He chased Ralph around the house, and cut him on the face and ripped his clothing several times with the knife. Ralph then grabbed a baseball bat from his room and swung it at defendant. By this time Mrs. Thomas was on her feet, and she and Ralph ran out the front door. Mrs. Thomas ran down the street toward the house next door and fell in the yard of the house at 120 West Elm Street. Ralph ran to a neighboring house to call an ambulance and the police. When he returned a police officer was present, and Mrs. Thomas was dead.

Teresa H. Howell, who lived across from Mrs. Thomas, saw Ralph Chandler and his mother come out of their house in the late afternoon of 4 October 1976. Mrs. Thomas was bleeding. Mrs. Howell ran to her phone to call the police. When she returned to her front door she saw Mrs. Thomas lying on her back in front of 120 West Elm Street, and defendant coming out of the house at 130 West Elm Street. He walked down the street to where Mrs. Thomas lay and leaned down beside her. Defendant apparently talked to Mrs. Thomas for a minute or more. He then took a

knife, held it to Mrs. Thomas's abdomen, and stabbed her. After this, he got up and walked away.

Don White, a Mount Airy police officer, drove to 130 West Elm Street at around 5:00 p.m. on 4 October 1976, pursuant to a radio call. There he saw Mrs. Thomas lying dead near the sidewalk.

David Beal, an S.B.I. agent, arrived on the scene shortly after 5:00 p.m. When he arrived, Mrs. Thomas was dead. Upon inspection of her body he discovered a small stab wound in her abdomen, and a large stab wound in her back near the shoulder blade. A large butcher knife with fresh blood on its blade was found in the yard of a nearby home.

Paul Shelton is the defendant's cousin and lives in Sheltontown, near Mount Airy. He went to his mother's home at 9:30 on the evening of 4 October 1976, and found defendant sitting in the living room talking with Shelton's mother. Afterwards, Shelton and defendant bought some beer and rode around. Defendant informed Shelton that he wanted to go back to Mount Airy because he had stabbed a drug pusher that afternoon and wanted to return home to check on his neighborhood. Shelton drove the defendant back to Elm Street in Mount Airy. He then drove defendant by the Mount Airy police station, but defendant refused to go inside. Shelton then suggested that they go to the hospital to see whether they could find out anything. At the hospital Shelton learned that a woman had been brought into the hospital that afternoon who had died of stab wounds. When he so informed the defendant, defendant stated: "Yes, I know, that is my wife. I killed her."

Mrs. Thomas died as a result of the wound to the right posterior chest.

The defendant offered evidence, summarized as follows:

Defendant lived with his mother, Mrs. Nora Thomas, in 1975 before he married the deceased. During this time he insisted on cooking his own food and refused to eat anything prepared by his mother, saying he was afraid that his mother was trying to poison him. On one occasion, about 3:00 a.m., defendant was discovered acting as though he were hanging curtains in the room. When asked about this the following morning he remembered nothing

about it. Defendant tried to hang himself two or three times prior to 4 October 1976. In January 1976 he had jumped from a tree with a rope around his neck. The rope broke and the defendant got up and walked into the house. When his mother asked him about this incident, defendant told her that he did not remember it, and further told her that he did not think she was his mother.

After his arrest but prior to 28 March 1977, defendant underwent two psychiatric examinations at Dix Hospital. Both times he was found to be capable of proceeding to trial. When Dr. James R. Isreal, a psychiatrist, examined him on 28 March 1977, the defendant did not have a psychosis. In Dr. Isreal's opinion, defendant suffered from alcoholism, had a personality disorder termed "passive dependent and passive aggressive," and had probably experienced psychotic episodes, or departures from reality, including hallucinations and paranoid delusions, at some time prior to his examination. On cross-examination the doctor admitted that none of the personality defects he referred to would prevent a person from functioning normally in society, and further admitted that the defendant was functioning in reality at the time he was examined. Dr. Isreal further testified that defendant scored 114 on his IQ test, above average and in the bright normal range.

Other facts pertinent to the decision are set out in the opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney General James E. Magner, Jr. for the State.*

*Stephen G. Royster for defendant appellant.*

MOORE, Justice.

Defendant's first assignment of error is based on the contention that the trial judge erred in denying his motion for continuance for purposes of obtaining further psychiatric examination to determine his sanity.

Defendant was arrested on 4 October 1976. On 26 October 1976 counsel for defendant filed a motion requesting that defendant be committed to Dorothea Dix Hospital for evaluation to determine defendant's capacity to proceed to trial as well as his sanity at the time of the commission of the crime. This motion

was granted and defendant underwent examination for two weeks at Dix Hospital. In a Diagnostic Conference Report filed by Billy W. Royal, M.D., dated 16 November 1976, the physician determined that the defendant was mentally capable of proceeding to trial. The defendant was also found to have reduced responsibility at the time of the crime, this being related to significant alcoholic ingestion.

On 22 December 1976 counsel for the defendant moved that defendant be recommitted to Dorothea Dix Hospital for further examination due to the initial examining physician's failure to give his opinion as to defendant's ability to distinguish between right and wrong. This motion was granted and defendant was recommitted to Dix Hospital. In a Diagnostic Conference Report filed 21 January 1977 by Bob Rollins, M.D., that physician stated that the defendant was able to plan and carry out goal-directed activity even though intoxicated, and that defendant met the minimum criteria for premeditation and deliberation. In his opinion the defendant did have diminished responsibility at the time of the offense, this being due to intoxication.

On 15 February 1977 defendant filed a motion for continuance on the ground that he had an appointment on 27 March 1977 to be examined by a private psychiatrist. At the March Term of Surry Superior Court defendant's case was continued until the May Term.

On 28 March 1977 defendant was examined by a private psychiatrist, J. Ray Isreal, M.D., and by a psychologist, Dr. David A. Hill, of the Bowman Gray School of Medicine. Dr. Hill administered certain uniform tests to defendant and submitted his findings to Dr. Isreal on 4 April 1977. The psychologist found that defendant's test scores were within normal limits and were above average in terms of intellectual functioning. The defendant was found to be impulsive and hostile. The psychologist suggested than an electroencephalogram test (EEG), or brain wave test, might possibly resolve questions as to whether or not defendant had suffered cerebral insult, but added that even if such condition were found it would not necessarily interfere with defendant's ordinary daily functioning.

For reasons not apparent from the record, Dr. Isreal did not submit a written evaluation to defendant's counsel until 25 April

1977. In Dr. Isreal's opinion the defendant had sufficient mental capacity to stand trial. He also found no evidence that the defendant suffered from a thought disorder. The defendant was found, however, to suffer from alcoholism, and was found likely to act impulsively, especially when intoxicated. Pursuant to the suggestion by Dr. Hill, Dr. Isreal recommended that the defendant have an electroencephalogram to determine if there had been ". . . prior cerebral insult which may have affected areas of the brain which might reduce impulse control and further contribute to his loss of impulse control when under the influence of alcohol. It is conceded that electroencephalographic examination probably would not help clarify this question. . . ."

On 28 April 1977 defendant moved for a continuance so that he might have an EEG examination as recommended by Dr. Isreal. This motion was denied by Seay, J., and defendant proceeded to trial at the 2 May 1977 Term of Surry Superior Court.

[1] A motion for continuance is ordinarily addressed to the sound discretion of the trial court and its ruling is not subject to review absent abuse of discretion. *State v. Brower*, 289 N.C. 644, 224 S.E. 2d 551 (1976); *State v. Smathers*, 287 N.C. 226, 214 S.E. 2d 112 (1975); *State v. Rigsbee*, 285 N.C. 708, 208 S.E. 2d 656 (1974). However, if the motion is based on a right guaranteed by the federal and State constitutions, the question presented is one of law and not of discretion, and the ruling of the trial court is reviewable on appeal. *State v. Brower, supra; State v. Harrill*, 289 N.C. 186, 221 S.E. 2d 325 (1975); *State v. Smathers, supra*. Whether a defendant bases his appeal upon an abuse of judicial discretion or a denial of his constitutional rights, he must show both that there was error in the denial of the motion and that he was prejudiced thereby before he will be granted a new trial. *State v. Robinson*, 283 N.C. 71, 194 S.E. 2d 811 (1973); *State v. Moses*, 272 N.C. 509, 158 S.E. 2d 617 (1967). Defendant urges both abuse of discretion and denial of his constitutional rights as error.

We first take up the issue whether there was an abuse of the trial judge's discretion in denying defendant's motion. At the pretrial hearing on defendant's motion on 2 May, the following occurred:

"COURT: That motion is denied. In denying the motion I make the finding that the record reflects and the statement

of counsel reflects that the defendant was arrested on October 1976, and had counsel appointed October of 1976, and that at the January Session of the Superior Court of Surry County, the defendant moved to continue the case, requesting that the accused or the defendant be sent for a second examination at the Dorothea Dix Hospital, that the request to the trial judge that the defendant be sent for an examination was denied and that counsel then contacted the resident judge, James Long, who agreed to sign the order sending the defendant for the second examination and motion for the defendant to continue the case was then granted, this event having occurred January 5, 1977. And the defendant has had more than an adequate time and opportunity to secure examination.

"MR. ROYSTER: Your Honor, if I may say this, I might have misled your Honor, my client was sent twice to Dorothea Dix and this is a private psychiatrist that examined the defendant March the 21st, or 22nd.

"COURT: Well, I will find that you have had an opportunity to have it done since that time. That motion is denied."

Defendant argues that the trial judge erred in finding that defendant had an opportunity to have the desired examination, since he did not receive the report from Dr. Isreal recommending the examination until 25 April 1977, and his case was called for trial on 2 May 1977. Defendant argues that this alleged error constitutes abuse of discretion. We do not agree.

The trial court found that the defendant had been arrested in October 1976. He was sent to Dix Hospital for psychiatric examination in November 1976. At the January Session of Surry Superior Court defendant moved for, and was granted, a continuance of his trial so that he could be examined a second time by a different physician at Dix Hospital. The results of this examination were similar to those of the initial examination — a finding that defendant was capable of proceeding to trial and capable of premeditation and deliberation. A second motion for continuance was made in February 1977 so that defendant might be examined a third time, and defendant's case was again continued and set for the May Term. Defendant was examined by Drs. Isreal and Hill the last week in March, and as early as 4 April 1977 Dr. Hill made

his recommendation to Dr. Isreal that the defendant undergo an EEG examination. Defendant's counsel apparently did nothing between the date of examination and 25 April (the date he alleges he first heard from Dr. Isreal) to find out if further examinations would be necessary before the trial in May.

[2]  Clearly, on these facts, the trial judge would be justified in his discretionary denial of a last minute motion for continuance. The defendant had had two prior continuances; had undergone four psychiatric examinations by four different doctors, all of whom had similar opinions regarding defendant's mental condition; and those doctors who recommended the EEG examination stated that it probably would yield no new information. No abuse of discretion has been shown.

[3]  We now turn to the contention that the denial of the motion for a continuance was a denial of defendant's constitutional rights. In *State v. Smathers*, 287 N.C. 226, 214 S.E. 2d 112 (1975), this Court, quoting from *State v. Farrell*, 223 N.C. 321, 26 S.E. 2d 322 (1943), said:

> "The authority to rule a defendant to trial in a criminal prosecution attaches only after the constitutional right of confrontation has been satisfied. The question is not one of guilt. Nor does it involve the merits of the defense he may be able to produce. It is whether the defendant has had an opportunity fairly to prepare his defense and present it. . . .

> " 'The rule undoubtedly is, that the right of confrontation carries with it not only the right to face one's "accuser and witnesses with other testimony" [N.C. Const. art. I, sec. 23 (1971)], but also the opportunity fairly to present one's defense. . . .' "

*See State v. Cradle*, 281 N.C. 198, 188 S.E. 2d 296 (1972); *State v. Lane*, 258 N.C. 349, 128 S.E. 2d 389 (1962). And, as we said in *State v. Baldwin*, 276 N.C. 690, 174 S.E. 2d 526 (1970): "Due process requires that every defendant be allowed a reasonable time and opportunity to investigate and produce competent evidence, if he can, in defense of the crime with which he stands charged and to confront his accusers with other testimony. [Citations omitted.]"

The specific question presented here is whether the denial of defendant's motion for a continuance in order to obtain an EEG examination deprived defendant of his right of confrontation and his right to due process under the federal and State constitutions. We think not. Had the EEG test been administered to determine whether defendant suffered from reduced impulse control, and had such reduced impulse control been discovered, such findings would not have established an insanity defense.

The test of insanity as a defense to a criminal charge was stated by Ervin, J., in *State v. Swink*, 229 N.C. 123, 47 S.E. 2d 852 (1948), as follows:

"[A]n accused is legally insane and exempt from criminal responsibility by reason thereof if he commits an act which would otherwise be punishable as a crime, and at the time of so doing is laboring under such a defect of reason, from disease of the mind, as to be incapable of knowing the nature and quality of the act he is doing, or, if he does know this, incapable of distinguishing between right and wrong in relation to such act. [Citations omitted.]"

Subsequent decisions of this Court are in strict accord: *See State v. Potter*, 285 N.C. 238, 249, 204 S.E. 2d 649, 656-57 (1974), and cases cited therein. And, as Justice Branch, speaking for the Court, said in *State v. Humphrey*, 283 N.C. 570, 196 S.E. 2d 516 (1973): ". . . North Carolina, as well as many other jurisdictions, has steadfastly refused to recognize the 'irresistible impulse doctrine' as a test of criminal responsibility. [Citations omitted.]" *See State v. Cooper*, 286 N.C. 549, 213 S.E. 2d 305 (1975); *State v. Spence*, 271 N.C. 23, 155 S.E. 2d 802 (1967), *rev'd on other grounds*, 392 U.S. 649, 20 L.Ed. 2d 1350, 88 S.Ct. 2290 (1968); *State v. Creech*, 229 N.C. 662, 51 S.E. 2d 348 (1948); *State v. Brandon*, 53 N.C. 463 (1862).

Since the so-called "irresistible impulse doctrine" is not recognized in North Carolina as a valid defense, the denial of the motion for continuance in order to take an EEG examination could not have infringed on defendant's constitutional rights. As stated in *State v. Baldwin*, 276 N.C. 690, 174 S.E. 2d 526 (1976), a similar case on its facts: ". . . Due process does not include the right to fish in psychiatric ponds for immaterial evidence." De-

fendant has shown no error in the denial of his motion for continuance. This assignment of error is overruled.

On 18 April 1977 defendant filed a motion requesting that he be permitted to examine each venireman privately before accepting or rejecting such prospective juror. On 22 April 1977 defendant filed an amendment to this earlier motion, and on 29 April 1977 he filed a supplement to the motion. Attached to the motion and supplement were three newspaper clippings from a local paper, all of which revealed that defendant was charged with the crime for which he was tried, and which also revealed that defendant was convicted of second degree murder in 1957 for the shooting death of one Sammy Belton. Defendant's motion to examine each prospective juror privately was denied in a pretrial hearing before the trial judge. The trial court found that such pretrial publicity ". . . would not prevent the defendant from having a fair trial under the law and wouldn't prevent counsel for the defendant from making inquiry of the jurors as to their fitness and competency to serve as jurors. . . ."

[4] Each defendant is entitled to full opportunity to face the prospective jurors, make diligent inquiry into their fitness to serve, and to exercise his right to challenge those who are objectionable to him. *State v. Boykin*, 291 N.C. 264, 229 S.E. 2d 914 (1976); *State v. Perry*, 277 N.C. 174, 176 S.E. 2d 729 (1970). *See also* G.S. 9-15(a). However, ". . . the actual conduct of the trial must be left largely to the sound discretion of the trial judge so long as the defendant's rights are scrupulously afforded him." *State v. Perry, supra.* Therefore, a motion to examine jurors individually, rather than collectively, is directed to the sound discretion which the trial court possesses for regulating the jury selection process. *State v. Young*, 287 N.C. 377, 214 S.E. 2d 763 (1975); *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721 (1974); *State v. Perry, supra. See also* 47 Am. Jur. 2d, Jury § 197; Annot., Voir Dire—Personal Examination, 73 A.L.R. 2d 1187, 1203 (1960). Contrary to defendant's contentions, the suggestion contained in *State v. Boykin, supra* (viz, that the lawyer in that case should have requested that prospective jurors be examined separately to determine if any had heard certain rumors about that defendant), does not give a defendant a right to separately examine each prospective juror for reasons of pretrial publicity. In fact, the Court in Boykin reaffirmed the trial judge's discretion

in regulating the manner and extent of inquiry at the *voir dire.* 291 N.C. at 272, 229 S.E. 2d at 919.

[5] In the present case the jury was selected in the manner approved by this Court in *State v. Perry, supra,* and in numerous other cases. *See State v. Young, supra; State v. Dawson,* 281 N.C. 645, 190 S.E. 2d 196 (1972); *State v. Cutshall,* 281 N.C. 588, 189 S.E. 2d 176 (1972); *State v. Atkinson,* 278 N.C. 168, 179 S.E. 2d 410 (1971), *rev'd as to death penalty,* 403 U.S. 948, 29 L.Ed. 2d 861, 91 S.Ct. 2292 (1971). Prior to the *voir dire* examination the trial judge asked the prospective jurors the following: "[A]re any of you familiar with the alleged events of October the 4th, 1976, involving a Johnny Lowell Thomas or Clara Chandler Thomas; do any of you have personal knowledge about those events; have any of you formed or expressed an opinion concerning this case? . . . Then I take it that the twelve of you sitting there have not formed or expressed an opinion about the guilt or innocence of this defendant in this case. . . ." Counsel for defendant and the district attorney stipulated that they asked each and every juror whether they knew of anything which would prevent them from giving the defendant or the State a fair trial, and each of those jurors who served on the jury answered that he did not know of any reason why he could not. Furthermore, there was nothing inflammatory or biased about the three news reports of this crime. Based on these facts, we hold that there was no abuse of discretion by the trial judge in denying defendant's motion to examine the prospective jurors separately. *See State v. Young, supra; State v. Perry, supra; State v. Jarrette, supra.* The precautions taken by the trial judge were sufficient to safeguard defendant's right to a fair and impartial jury.

[6] Neither did the trial judge err in denying defendant's post-trial motion to ask jurors concerning their knowledge of defendant's previous conviction of murder, and the effect, if any, it may have had on their deliberations. Defendant had the opportunity to examine each juror on *voir dire* regarding his or her exposure to any pretrial publicity concerning the case. This opportunity, coupled with defendant's failure to exhaust his peremptory challenges, operates as a waiver of any right to object to the trial court's denial of his post-trial motion. *Cf. State v. Boykin, supra.* Denial of this motion also was in the sound discretion of the trial judge.

Defendant's sixth assignment of error addresses a related point. He contends that the trial court failed to give due consideration to his pretrial motion to examine each prospective juror separately, and that this alleged failure to duly consider his written motion is prejudicial error. Since we have held, *supra*, that the trial judge did not err in refusing to grant defendant's pretrial motion to question each prospective juror separately, and that the trial judge took precautions to insure that no juror had prior knowledge of defendant's crime, any alleged failure to consider the facts underlying defendant's pretrial motion could not have been prejudicial to the defendant. Additionally, the record shows that the trial judge did in fact consider the evidence presented with defendant's pretrial motion. This assignment of error is overruled.

[7] During the trial the State introduced a number of photographs for the purpose of illustrating the testimony of witnesses concerning the location of wounds on the body of the deceased and the presence of bloodstains in various places within the house. Defendant contends it was prejudicial error to introduce so many photographs (a total of twelve), especially so many showing bloodstains. Six of the photographs showed the bloodstained interior of the house where deceased was allegedly stabbed. These photographs were offered for the purpose of illustrating the testimony of Ralph Chandler, who described the location of the stabbing and his mother's actions and movements after the stabbing, and the testimony of witnesses who described the interior of the house and bloodstains found therein shortly after the stabbing. Three other photographs depict the exterior of the house and the street. These photographs illustrate testimony concerning Mrs. Chandler's movements after she exited the house, and the spot where she was stabbed a second time. Only four of the photographs were of the deceased. Two of these showed the bruises on either side of deceased's face; a third, the chest wound; and the fourth, the wound in the abdomen. These photographs illustrated the testimony of the witness Ralph Emerson Chandler and that of the pathologist who examined the body of the deceased. Only one photograph of each severe wound was introduced. There was nothing gory or gruesome about any of these.

Photographs are admissible in this State to illustrate the testimony of a witness and their admission for that purpose under proper limiting instructions is not error. *State v. Crowder*, 285 N.C. 42, 203 S.E. 2d 38 (1974); *State v. Duncan*, 282 N.C. 412, 193 S.E. 2d 65 (1972); *State v. Cutshall*, 278 N.C. 334, 180 S.E. 2d 745 (1971). *See generally* 1 Stansbury, North Carolina Evidence § 34 (Brandis rev. 1973). When a photograph is properly authenticated as a correct portrayal of conditions observed and related by the witness who uses it to illustrate his testimony, it is admissible for that purpose. *State v. Crowder, supra; State v. Atkinson*, 275 N.C. 288, 167 S.E. 2d 241 (1969); *State v. Porth*, 269 N.C. 329, 153 S.E. 2d 10 (1967). The photographs in this case were used in accordance with the rule, and defendant's assignment of error is overruled.

[8] Under the same assignment of error defendant objects to the introduction of a photograph of the butcher knife found in the yard of a nearby home. This photograph was introduced to illustrate the testimony of David Beal, the S.B.I. agent investigating the homicide, who testified concerning the location of the knife when found, and also described the knife itself. It was competent for that purpose. *State v. Crowder, supra; State v. Atkinson, supra; State v. Porth, supra.*

[9] Defendant next assigns as error the introduction of the butcher knife into evidence. The evidence of the witness Ralph Emerson Chandler describing the knife used by defendant, and evidence that a freshly bloodstained knife answering this description was found nearby, were sufficient identification to allow its introduction into evidence. In *State v. King*, 287 N.C. 645, 215 S.E. 2d 540 (1975), a murder case in which a hammer was found some 385 feet from the scene of the murder, we stated: "Any object which has a relevant connection with the case is admissible in evidence and weapons may be admitted when there is evidence tending to show that they were used in the commission of the crime. [Citations omitted.] . . ." The fact that the knife in question was found some distance from the scene of the crime would not render the evidence incompetent but would only affect its probative force. *State v. King, supra; State v. Brown*, 280 N.C. 588, 187 S.E. 2d 85 (1972); *State v. Payne*, 213 N.C. 719, 197 S.E. 573 (1938).

[10] Finally, defendant assigns as error the failure of the trial judge to sustain his motion to dismiss on the charge of first degree murder at the close of the State's evidence and at the close of all the evidence. Defendant contends that there was not sufficient evidence of premeditation and deliberation to go to the jury on the question of first degree murder, and that his motion, therefore, should have been allowed.

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Davis*, 289 N.C. 500, 223 S.E. 2d 296 (1976); *State v. Duboise*, 279 N.C. 73, 181 S.E. 2d 393 (1971); *State v. Reams*, 277 N.C. 391, 178 S.E. 2d 65 (1970), *cert. denied*, 404 U.S. 840, 30 L.Ed. 2d 74, 92 S.Ct. 133 (1971); G.S. 14-17.

Premeditation may be defined as thought beforehand for some length of time. " 'Deliberation means . . . an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design . . . or to accomplish some unlawful purpose. . . .' *State v. Faust*, 254 N.C. 101, 118 S.E. 2d 769." *State v. Perry*, 276 N.C. 339, 172 S.E. 2d 541 (1970). *See State v. Davis*, *supra*. Ordinarily, premeditation and deliberation are not susceptible of proof by direct evidence, and therefore must usually be proved by circumstantial evidence. Among the circumstances to be considered in determining whether a killing is done with premeditation and deliberation are: (1) the want of provocation on the part of deceased; (2) the conduct of defendant before and after the killing; (3) the vicious and brutal manner of the killing; and (4) the number of blows inflicted or shots fired. *State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712 (1974); *State v. Perry, supra*.

When there is a motion for judgment as of nonsuit in a criminal case, the evidence is to be considered in the light most favorable to the State, and the State is entitled to every reasonable inference of fact deducible from the evidence. *State v. McKinney*, 288 N.C. 113, 215 S.E. 2d 578 (1975); *State v. McNeil*, 280 N.C. 159, 185 S.E. 2d 156 (1971). If there is substantial evidence, whether direct, circumstantial or both, to support a finding that the offense charged has been committed and that defendant committed it, a case for the jury is made out and nonsuit should be denied. *State v. McKinney, supra; State v. Cook*, 273 N.C. 377, 160 S.E. 2d 49 (1968).

In present case the State offered evidence tending to show that defendant broke into the house occupied by his wife, the victim, and her son after he had been refused admittance. Defendant approached his wife with arms outstretched as if to embrace her, pulled a concealed butcher knife from underneath his shirt and stabbed her, inflicting a wound which subsequently caused her death. Not content with this defendant followed his wife into the yard, and, as she was lying upon the ground, knelt beside her and without provocation plunged the knife into her abdomen. These two wounds caused her death almost immediately. In our opinion, when taken in the light most favorable to the State, this evidence was sufficient to permit the jury to reasonably infer that defendant, with malice, after premeditation and deliberation, formed a fixed purpose to kill his wife and thereafter accomplished that purpose. We hold, therefore, that the evidence was sufficient to be submitted to the jury on the charge of first degree murder. This assignment of error is overruled.

We have carefully examined the entire record and find no error that would justify disturbing the verdict or judgment.

No error.